**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 28 EAP 2016 |
| | : | |
| Appellant | : | Appeal from the Judgment of Superior |
| | : | Court entered on 12/21/2015 at No. |
| | : | 1702 EDA 2014 (reargument denied |
| v. | : | 02/11/2016) affirming the Order entered |
| | : | on 04/02/2014 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| SALEEM SHABEZZ, | : | Division at No. CP-51-CR-0015450- |
| | : | 2013. |
| Appellee | : | |
| | : | ARGUED: March 8, 2017 |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 29 EAP 2016 |
| | : | |
| Appellant | : | Appeal from the Judgment of Superior |
| | : | Court entered on 12/21/2015 at No. |
| | : | 1639 EDA 2014 (reargument denied |
| v. | : | 02/11/2016) affirming the Order entered |
| | : | on 05/15/2014 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| SALEEM SHABEZZ, | : | Division at No. CP-51-CR-0012538- |
| | : | 2013 |
| Appellee | : | |
| | : | ARGUED: March 8, 2017 |

**OPINION**

**JUSTICE WECHT**                                    **DECIDED: July 19, 2017**

On June 1, 2013, Saleem Shabezz was a passenger in a vehicle that was seized unconstitutionally by police officers. Following the stop, the officers searched the vehicle, finding drugs and weapons in various locations and compartments, as well as on Shabezz' person. The question that we confront today is whether an illegal seizure entitles a passenger to suppression only if he can establish a reasonable expectation of

privacy in the areas of the car where the evidence was found, or whether that evidence instead is barred outright as fruit of the poisonous tree. We hold that the contested evidence, tainted by the initial illegality, must be suppressed, even absent a demonstrable expectation of privacy in the locations where the evidence was found. Accordingly, we affirm the Superior Court's order, and we remand this case to the trial court for further proceedings.

## I.

As a result of the evidence obtained by the police, Shabezz was charged with possession of a controlled substance with intent to deliver, conspiracy, persons not to possess a firearm, carrying a concealed weapon without a license, possession of a small amount of marijuana, and possession of an instrument of crime. Additionally, because the weapon found in the car was stolen and was linked to another crime, Shabezz also was charged in a separate case with robbery and related firearms offenses. During the pendency of the cases, the driver of the vehicle, Sean McCorty, filed a suppression motion, which Shabezz joined. The following is a summary of the testimony presented at a subsequent hearing on the motion.

In June 2013, Sergeant Michael Cerruti was commanding a narcotics enforcement team in a Philadelphia neighborhood. The team was comprised of Sgt. Cerruti and four other police officers. Certain areas were designated as "hot areas" based upon information developed through the team's own investigations and from Philadelphia's narcotics tip hotline. Notes of Testimony ("N.T."), 4/2/2014, at 8. One such "hot area" was the parking lot of a McDonald's restaurant located at the intersection of Cottman Avenue and Roosevelt Boulevard. According to Sgt. Cerruti, the lot was a popular place for drug trafficking due to its convenient location and the ease with which the buyer and seller could enter, conduct the transaction, and exit. As

a result, Sgt. Cerruti had arrested "hundreds" of individuals for drug-related offenses in that parking lot. *Id.* at 9.

At times, due to various factors such as increased police presence or civilian traffic, the drug transactions would commence in one place, but conclude at another location. The buyer and seller initially would meet at the McDonald's and, if the deal could not be completed there, would then proceed to a nearby 7-11 convenience store that was located two blocks from the McDonald's at the intersection of Cottman Avenue and Brous Avenue. The parties then would complete the transaction at the 7-11.

At approximately 7:30 p.m. on June 1, 2013, Sgt. Cerruti and his team set up surveillance of the McDonald's and the 7-11. One team member, Officer Steven Burgoon, received a report from another surveilling officer, Officer Apostalu,[1] that individuals believed to be engaged in a drug transaction were exiting the parking lot of the McDonald's in a tan Nissan. Officer Burgoon and his partner, Officer James Wade, located the tan Nissan and followed it to the 7-11. The driver of the Nissan parked at the 7-11, and remained in the car. A short time later, a person later identified as McCorty drove a red Acura into the lot and parked a few spots away from the Nissan. At that point, a person later identified as Shabezz exited the passenger side of the Acura and approached the Nissan.

As Shabezz approached the Nissan, Officer Burgoon positioned his unmarked police vehicle approximately forty-five feet away. At the suppression hearing, Officer Burgoon testified that he observed Shabezz open the passenger-side door of the Nissan, reach in, and conduct a hand-to-hand transaction with the driver. Officer Burgoon explained that, even without the assistance of binoculars, he saw Shabezz use

---

[1]     Officer Apostalu's first name does not appear in the notes of testimony.

a cupping and dropping motion to transfer small objects into the driver's hand. Almost simultaneously, Officer Burgoon watched Shabezz take something, presumably money, from the driver's hand in a similar cupping motion. Despite the detail with which Officer Burgoon explained this transaction while testifying at the suppression hearing, none of these particulars appeared in the incident reports that were prepared within hours of Shabezz' arrest. Those reports indicated only that Shabezz opened the passenger door, leaned inside, and conducted a brief conversation with the driver.

Officer Burgoon informed Sgt. Cerruti that he had seen suspicious behavior that he believed resembled a drug transaction similar to those that had occurred previously in the lot. At that time, Officer Burgoon did not tell Sgt. Cerruti that he had seen Shabezz use the cupping and dropping motion, or that he had seen the exchange of small objects. (Officer Burgoon would later assert this at the suppression hearing). Sgt. Cerruti immediately ordered the surveillance team to seize the vehicles.

As this was happening, Shabezz returned to the red Acura, which then attempted to exit the lot. Officer Burgoon drove toward the Acura and positioned the nose of his vehicle against the nose of the Acura, preventing the Acura from leaving the scene. At the same time, Sgt. Cerruti stopped the tan Nissan, and positioned his vehicle in such a way that the Acura could not back up. The Acura could not move forward or backward without striking a police vehicle.

Shabezz exited the Acura and fled on foot. Officer Burgoon and Officer Apostolu gave chase, apprehending Shabezz a few blocks away on Cottman Avenue. Officer Apostolu searched Shabezz and found a bag containing marijuana and $1,800 in cash. Officer Burgoon then returned to the 7-11 lot. By the time he arrived, other police officers had arrested McCorty and one Carl Halen, who had been sitting in the rear of

the Acura. Sgt. Cerutti also arrested one Callahan,[2] the driver of the Nissan. The sergeant found a baggie containing marijuana in the center console of the Nissan.

After all four individuals were arrested, Officer Wade searched the Acura. He located a black and gray bag on the floor of the front passenger seat area. Inside the bag, Officer Wade found seven heat-sealed bags of marijuana, one Ziploc baggie containing marijuana, two scales, a box of unused Ziploc baggies, and one clear knotted baggie that held more empty Ziploc baggies. In the rear passenger area, Officer Wade found another bag, which held additional bags of marijuana and a jar containing two pills. Officer Wade also recovered a bag of marijuana that he maintained had been sitting atop the center armrest between the front seat and the driver's seat. Officer Apostolu found a nine millimeter handgun in the glove compartment.

At the conclusion of the hearing, the trial court granted the suppression motion as to all of the physical evidence, including the marijuana and money found on Shabezz' person. The court based its decision initially upon two grounds. First, the court determined that nothing prevented the police officers from obtaining a search warrant before searching the vehicles. The court found that, if the testimony was credible that drugs were in plain view on top of the center console, the officers would have had unassailable probable cause and could have secured a search warrant. Second, the court found certain testimony from the officers to be untruthful. Specifically, the court did not believe Officer Burgoon's testimony that he could see the purported drug transaction from forty-five feet away. In light of the trial court's ruling, all of the evidence was suppressed for purposes of Shabezz' robbery case as well.[3]

---

[2]  Callahan's first name does not appear in the notes of testimony.

[3]  The two cases were assigned to different judges. The Honorable Paula Patrick was assigned to preside over the drug case, and was the judge who granted the motion to suppress. The Honorable Earl Trent was assigned to the robbery case. Before (continued…)

The Commonwealth filed an unsuccessful motion for reconsideration of the suppression ruling, and then appealed to the Superior Court. In its Pa.R.A.P. 1925(b) statement, the Commonwealth argued, *inter alia*, that Shabezz, as a passenger, was not entitled to suppression of the evidence because he had failed to demonstrate a reasonable expectation of privacy in the areas and compartments of the Acura that were searched.

In its Pa.R.A.P. 1925(a) opinion, the trial court first detailed its findings of fact and its credibility determinations, including its conclusion that the police officers could not, and, therefore did not, see a drug transaction that would have established probable cause or reasonable suspicion to justify the seizure of the Acura. *See* Trial Court Opinion ("T.C.O."), 8/13/2014, at 4 (explaining that the court did not believe that Officer Burgoon actually saw a hand-to-hand transaction); 5 (determining that Officer Burgoon could not see what he testified to from forty-five to fifty feet away "in the dark of night"); 7 (holding that the true facts were those contained in the officers' incident reports, which stated only that Shabezz leaned into the Nissan and had a brief conversation); 8 (disbelieving Officer Wade's testimony that drugs were located on top of the center console, and instead believing the incident reports that indicated that the drugs were found inside the console and out of plain view); and 9 (explaining that "[n]o crimes were ever actually observed. No criminal activity was ever observed," and that, based upon the credibility findings, "these officers merely observed a group of men speaking with one another near or inside their vehicles in a parking lot;" the court also noted that any testimony to the opposite "plainly was not credited").

<hr>

(…continued)
Judge Trent, the Commonwealth conceded that Judge Trent was bound by Judge Patrick's suppression ruling under the coordinate jurisdiction rule, and that the evidence had to be suppressed for purposes of the robbery charges as well.

Based upon its credibility findings, the court explained that the police lacked any constitutionally justifiable basis to stop the vehicles. The court also held that, because there was no basis to stop the cars, the police also were not in a lawful vantage point for plain view purposes when Officer Wade allegedly observed contraband in the car, an observation which the court did not believe regardless. The court did not discuss the Commonwealth's claim that Shabezz was not entitled to suppression because he could not demonstrate an expectation of privacy in any of the searched areas of the Acura.

In a published opinion authored by the Honorable Victor Stabile, the Superior Court affirmed the suppression order. *See Commonwealth v. Shabezz*, 129 A.3d 529 (Pa. Super. 2015). Before that court, the Commonwealth advanced two distinct arguments. First, the Commonwealth argued that Shabezz did not have an expectation of privacy in the areas of the Acura that were searched and, thus, was not entitled to suppression. Second, the Commonwealth maintained that the record did not support the trial court's findings of fact, including the trial court's ultimate determination that Officer Burgoon did not, in fact, observe a drug transaction. The Superior Court began with the Commonwealth's second argument.

Regarding the trial court's factual findings, the Superior Court held that the record supported the trial court's decision to disbelieve Officer Burgoon's testimony and to credit the facts set forth in the incident reports instead. The court concluded that "the record contains evidence supporting the trial court's finding that [Shabezz] and the Nissan driver engaged only in conversation," *id.* at 533, and that the court was bound by that conclusion. *Id.* at 534. In light of the facts as found by the trial court, the Superior Court held that the seizure of the Acura, and the concomitant seizure of Shabezz, were not justified by the constitutionally required level of articulable suspicion. *Id.* at 534-35.

After holding that the stop was unconstitutional, the Superior Court, citing the United States Supreme Court's decision in *Brendlin v. California*, 551 U.S. 249 (2007), noted that a vehicle stop constitutes a seizure of each and every occupant of the vehicle. Accordingly, the Superior Court held, all of the occupants had standing to challenge the constitutionality of the vehicle stop. *Shabezz*, 129 A.3d at 535. Apparently assuming that standing resolved the Commonwealth's expectation of privacy argument, the Superior Court upheld the trial court's suppression order without any further discussion of the Commonwealth's contention.

President Judge Emeritus Kate Ford Elliot joined the majority opinion, but also filed a concurring statement to "address the Commonwealth's argument that [Shabezz] was required to prove a reasonable expectation of privacy in the searched car under the circumstances of this case." *Id.* Judge Ford Elliot agreed with the majority that the vehicle stop was illegal, and explained that, because "the instant case is an illegal seizure case and not an auto search case, [Shabezz'] expectation of privacy in the vehicle is not at issue." *Id.* at 536. Judge Ford Elliot invoked *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006), in which the United States Court of Appeals for the Third Circuit explained that "[t]he dispositive legal issue is the causal relationship between the traffic stop and the discovery of evidence: whether the evidence found in the car was 'fruit' of the illegal stop." *Shabezz*, 129 A.3d at 536.[4]

We granted allowance of appeal to consider the following issue: "Does the Fourth Amendment entitle a defendant to suppress the fruits of a search where it is

---

[4]     Former Justice James Fitzgerald concurred in the result reached by the majority. Judge Victor Stabile, the majority author, and Justice Fitzgerald both joined Judge Ford Elliot's concurring statement.

undisputed that he had no privacy interest in the area searched?" *Commonwealth v. Shabezz*, 141 A.3d 1286 (Pa. 2016) (*per curiam*).

## II.

It is critical first to underscore what is not at issue in this case. We are not weighing the correctness of the trial court's factual findings. Nor are we assessing that court's determination that the vehicle stop was unconstitutional. Moreover, we are not reviewing the validity of the Superior Court's affirmance of those particular holdings. For purposes of this appeal, we accept that the stop was unconstitutional, and we limit our focus to the question upon which we granted *allocatur*. We inquire whether, following an unconstitutional vehicle stop, the Fourth Amendment requires a passenger to demonstrate a reasonable expectation of privacy in those areas of the vehicle that are searched and that yield incriminating evidence, or whether that evidence automatically is suppressible as fruit of the poisonous tree, regardless of the presence or absence of an expectation of privacy?[5] Because this issue implicates constitutional requirements and is a question of law, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Chase*, 960 A.2d 108, 112 (Pa. 2008).

We begin where the Superior Court majority's analysis ended. That court effectively held that, because Shabezz was seized by police, he had standing to challenge the police action. The court seemingly believed that the fact of the seizure ended the inquiry. It did not.

---

[5] The fruit of the poisonous tree analysis also requires consideration of whether the taint of the original illegality is removed, for example, by sufficient attenuation between the illegality and the recovery of incriminating evidence, or by some other independent intervening act. We discuss the circumstances that purge the taint of an illegality, and whether any of those are present in this case, in more detail later in this opinion.

In *Weeks v. United States*, 232 U.S. 383 (1914), the United States Supreme Court held for the first time that violations of the protections afforded by the Fourth Amendment to the United States Constitution required suppression pursuant to the exclusionary rule newly announced in that case. As courts explored the applicability of that rule, the doctrine of Fourth Amendment standing emerged. *See Commonwealth v. Sell*, 470 A.2d 457, 459-60 (Pa. 1983) (collecting sources). The standing requirement was premised upon the notion that Fourth Amendment rights are personal, and that one cannot assert a violation of the constitutional rights of another. *Id.* at 460 (collecting federal cases). Standing existed only when a defendant claimed that his or her own rights were violated.

In *Jones v. United States*, 362 U.S. 257, 263 (1960), the United States Supreme Court conferred "automatic standing" upon defendants charged with a possessory offense. However, automatic standing enjoyed only a brief career in federal constitutional law. *Rakas v. Illinois*, 439 U.S. 128 (1978), was the first signal of the doctrine's decline. There, the High Court altered the review paradigm for Fourth Amendment challenges to government action under the Fourth Amendment. After reiterating the central principle that Fourth Amendment rights are personal and cannot be vicariously asserted, *Rakas*, 439 U.S. at 133-34 (citations omitted), the Court shifted the relevant focus from whether a person has standing to whether the person seeking the protection of the Fourth Amendment has a "legitimate expectation of privacy in the invaded place." *Id.* at 143.

Automatic standing finally was purged from the federal system in *United States v. Salvucci*, 448 U.S. 83 (1980), and *Rawlings v. Kentucky*, 448 U.S. 98 (1980). Issued on the same day, *Salvucci* and *Rawlings* brought all Fourth Amendment claims within *Rakas*' "legitimate expectation of privacy" framework, including claims raised by

defendants charged with possessory offenses. These cases instructed courts to apply a totality of the circumstances test to determine whether such an expectation of privacy existed.

As the standing doctrine meandered through the federal courts, and before it ultimately reached its end, we adopted the United States Supreme Court's automatic standing doctrine as a matter of Pennsylvania constitutional law. *See Commonwealth v. Knowles*, 327 A.2d 19, 21-22 (Pa. 1974) (embracing "automatic standing" as a state constitutional principle). In *Sell*, following *Salvucci and Rawlings*, this Court was called upon to determine whether to retain the doctrine under Article I, Section 8 of the Pennsylvania Constitution, or to abandon it as the Supreme Court had done. This Court recognized our inherent authority to recognize rights under our state constitution more expansive than those perceived by our federal counterpart, and noted that we have not "hesitated to interpret the Pennsylvania Constitution as affording greater protections" to individuals. *Sell*, 470 A.2d at 467. We opined that the Pennsylvania Constitution "mandates greater recognition of the need for protection from illegal governmental conduct offensive to the right to privacy," *id.* at 468, and we retained "automatic standing" as a constitutional principle. *Id.* at 469.

The automatic standing doctrine survives in our Commonwealth today. However, its operation does not qualify a defendant automatically to relief. "Standing denotes the existence of a legal interest," *Commonwealth v. Peterson*, 636 A.2d 615, 617 (Pa. 1993), and entitles a defendant to file a suppression motion and to have that motion adjudicated by a court; nothing more. It allows the defendant to get his or her foot in the courtroom door; more is required before suppression becomes an available remedy. Recently, we explained the limits of standing as follows:

> Generally, to have standing to pursue a suppression motion under
> Pa.R.Crim.P. 581, the defendant's own constitutional rights must have

been infringed. However, it is well settled that a defendant charged with a possessory offense in this Commonwealth has "automatic standing" because "the charge itself alleges an interest sufficient to support a[ ] claim [under Article I, § 8]." *Sell*, 470 A.2d at 468 (1983) (citation and internal quotation marks omitted). This rule entitles a defendant to a review of the merits of his suppression motion without a preliminary showing of ownership or possession in the premises or items seized, *Peterson*, 636 A.2d at 617[. . . .] In addition to standing, though, a defendant must show that he had a privacy interest in the place invaded or thing seized that society is prepared to recognize as reasonable. *Commonwealth v. Hawkins*, 718 A.2d 265, 267 (Pa. 1998) (citation omitted).

While cursorily similar, standing and privacy interest[s] are different concepts serving different functions. Standing is a legal interest that "empowers a defendant to assert a constitutional violation and thus seek to exclude or suppress the government's evidence pursuant to the exclusionary rules under the Fourth Amendment [to] the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution." *Id.* at 266 (citations omitted). It ensures [that] a defendant is asserting a constitutional right of his own. *See id.* at 269 (citations omitted) (noting this Court's refusal to recognize vicarious assertions of constitutional rights). The expectation of privacy is an inquiry into the validity of the search or seizure itself; if the defendant has no protected privacy interest, neither the Fourth Amendment nor Article I, § 8 is implicated. *See Commonwealth v. White*, 327 A.2d 40, 42 (Pa. 1974). In essence, while a defendant's standing dictates when a claim under Article I, § 8 may be brought, his privacy interest controls whether the claim will succeed—once a defendant has shown standing, "[h]e must, in short, having brought his claim, demonstrate its merits by a showing of his reasonable and legitimate expectation of privacy in the premises." *Peterson*, 636 A.2d at 618 (citation omitted).

*Commonwealth v. Enimpah*, 106 A.3d 695, at 698-99 (Pa. 2014).

The Superior Court majority correctly concluded that Shabezz, having been seized and subsequently charged with possessory offenses in Pennsylvania, had automatic standing to challenge the constitutionality of the seizure. But, as we made clear in *Enimpah*, that only got Shabezz into court. Standing is a constitutionally necessary inquiry, but it does not resolve the question of whether Shabezz is entitled to relief.

To answer that question, we must determine whether the illegal seizure, by itself, renders all tainted evidence suppressible as fruit of the poisonous tree, regardless of where the evidence was found, or whether the Commonwealth is correct that Shabezz first must prove an expectation of privacy in the areas where the poisoned fruit was found. In *Mosley*, the Third Circuit, addressing the precise legal issue at issue in the case *sub judice*, framed the inquiry as follows:

> Is an illegal traffic stop of a car occupied by a driver and a passenger a single constitutional violation, with two victims, each of whom can seek to suppress all fruits of that violation? Or is it analytically separable into two individual constitutional violations, each with one victim, each of whom may seek to suppress only the fruits of the violation of his individual right?

*Mosley*, 454 F.3d at 257-58. The former inquiry requires a straightforward application of the fruit of the poisonous tree doctrine, while the latter functionally ignores the initial constitutional violation and requires an independent consideration of whether the passenger has a reasonable expectation of privacy in areas within which evidence is located. The Commonwealth supports the latter approach, while Shabezz endorses the former. Like the Third Circuit in *Mosley*, we hold that evidence derived from an illegal automobile search constitutes fruit of the poisonous tree as a result of the illegal seizure (unless the taint is removed), and that no further demonstration of a privacy interest in the area from which the evidence was seized is required by the Fourth Amendment.

**III.**

The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Fourth Amendment requires that searches and seizures be reasonable." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). When a police officer effectuates a vehicle stop, the vehicle, and, more importantly, the driver are seized, and, as with all other constitutional actions, that seizure must be reasonable. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (explaining that an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.") More relevant herein, passengers of the vehicle also are seized for constitutional purposes. *See Brendlin*, 551 U.S. at 257, 263 (holding that passengers would not feel free to leave when the vehicle in which they are riding is stopped by police officers, and, therefore, they are seized under the Fourth Amendment).

Pursuant to *Brendlin*, Shabezz was seized when the vehicle in which he was a passenger was surrounded by police cruisers.[6] As noted, we accept here that the seizure was without the requisite level of suspicion. The Commonwealth nonetheless maintains that the illegal seizure does not lead automatically to suppression. The Commonwealth argues that Shabezz must also demonstrate a reasonable expectation

---

[6] Regarding the actual seizure of Shabezz, the Commonwealth now argues that, under prevailing Fourth Amendment jurisprudence, Shabezz was not seized because he fled from the officers who attempted to seize him. The Commonwealth contends that, pursuant to *Brendlin*, there was no seizure "without actual submission," and that, at most, the interaction amounted to an "attempted seizure." Brief for the Commonwealth at 22 (citing *Brendlin* 551 U.S. at 254; *California v. Hodari D.*, 499 U.S. 621 (1991)). This is the first time that the Commonwealth makes this argument. Indeed, the Commonwealth did not pursue this line of attack before the Superior Court. The argument is waived as an avenue for relief before this Court. *See* Pa.R.A.P. 302(a).

Notably, but immaterial herein, we have held that the Pennsylvania Constitution does not align with *Brendlin* and *Hodari D.* regarding when a person is seized for constitutional purposes, including a person who flees apprehension. *See Commonwealth v. Matos*, 672 A.2d 769, 776 (Pa. 1996).

of privacy in the areas within which incriminating evidence was found. The flaw in the Commonwealth's argument is that it assigns no constitutional significance to the illegal seizure, ignoring the fact that the seizure itself was a constitutional violation. The Commonwealth would require Shabezz to prove two constitutional violations before being entitled to suppression on one. The United States Supreme Court has never endorsed this additional layer of proof as a constitutional prerequisite to relief following an illegal seizure. Nor are we prepared to do so.

The Commonwealth accurately conveys the holdings of numerous cases issued by the United States Supreme Court touching upon the general mandate that, in order to demonstrate that a search was unconstitutional, the defendant first must demonstrate that he or she possessed an expectation of privacy in the area searched. For instance, in *California v. Ciraolo*, 476 U.S. 207 (1986), the Court, quoting Justice Harlan's influential concurring opinion in *Katz v. United States*, 389 U.S. 347, 360 (1967), emphasized that "[t]he touchstone of [a] Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *Ciraolo*, 476 U.S. at 211 (internal quotation marks omitted). It is indisputable that a "State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112 (1986) (internal quotation marks omitted). To establish such an expectation, a defendant first must manifest "a subjective expectation of privacy in the object of the challenged search," and then demonstrate that "society [is] willing to recognize that expectation as reasonable." *Ciraolo*, 476 U.S. at 211.

Accurate though they are, these principles nonetheless are beside the point. In reviewing challenges to seizures under the Fourth Amendment, we engage in the

following analysis. First, we determine whether there was a seizure. If there was, we then must ascertain whether the seizure was justified by the requisite level of suspicion. If it was, there was no constitutional violation. But, if it was not, then the seizure was illegal, and we must determine what must occur with regard to any evidence obtained following the illegal seizure. *See Mosley*, 454 F.3d at 257. In other words, we must determine whether the evidence was "fruit of the poisonous tree."

In *Wong Sun v. United States*, 371 U.S. 471 (1963), the United States Supreme Court articulated the test for determining whether evidence must be suppressed. There, the Court held that evidence constitutes poisonous fruit, and, thus, must be suppressed, if, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (citation and internal quotation marks omitted). Notably, this bedrock principle contains no independent assessment of the moving party's expectation of privacy, nor has the United States Supreme Court ever attached such a requirement to *Wong Sun*'s exploitation test. The inquiry simply is whether the evidence was obtained via exploitation of the initial illegality. As the *Mosley* Court put it, when the defendant seeking suppression following an illegal vehicle stop is the passenger, "[t]he dispositive legal issue is the causal relationship between the traffic stop and the discovery of the evidence: whether the evidence found in the car was 'fruit' of the illegal stop." *Mosley*, 454 F.3d at 253 . So long as the taint of the initial illegality has not been removed by other circumstances, the inquiry involves nothing more.

Our holding is consistent with the substantial weight of federal appellate precedent addressing the application of the fruit of the poisonous tree doctrine in cases where a passenger in a vehicle seeks suppression following an unconstitutional stop.

*See United States v. Gaines*, 668 F.3d 170, 171-76 (4th Cir. 2012); *Mosley*, 454 F.3d at 269; *United States v. Chanthasouxat*, 342 F.3d 1271, 1281 (11th Cir. 2003); *United States v. Reed*, 349 F.3d 457, 465-66 (7th Cir. 2003); *United States v. Guevara-Martinez*, 262 F.3d 751, 755 (8th Cir. 2001); *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000); *United States v. Jones*, 234 F.3d 234, 242-43 (5th Cir. 2000) (reversed in part on other grounds by *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010)); *United States v. Kimball*, 25 F.3d 1, 5-6, & n.3 (1st Cir. 1994).[7]

The Commonwealth's attempt to graft an additional inquiry onto an analysis of remedy following an established violation would require courts to ignore the "primary illegality," and would countenance those constitutional violations without recourse. The United States Supreme Court has never required as much, and we find no basis to do so. The Commonwealth's view that such an inquiry is required stems necessarily from its misapprehension of the character of this case. This case is about an illegal **seizure** of a vehicle and its occupants. It is not a vehicle **search** case. To be sure, if this were a vehicle search case, one in which the initial stop and seizure of the vehicle was constitutional, then the Commonwealth would be correct that Shabezz would have had to demonstrate an expectation of privacy in the areas of the vehicle searched in order to prove a violation of the Fourth Amendment. The general cases cited by the Commonwealth would then govern for purposes of determining whether a constitutional

---

[7]     *But see United States v. Deluca*, 269 F.3d 1128 (10th Cir. 2001) (requiring a passenger to demonstrate a factual nexus between the illegality and the challenged evidence following a vehicle stop). As evidenced by the other federal appellate decisions, the *Deluca* rule is not widely accepted or applied. As the Third Circuit explained in *Mosley*, the initial traffic stop in *Deluca* was legal. It was only the detention of the passenger following the legal stop that was at issue. *Deluca*'s "factual nexus" test is "relevant only to situations in which the initial traffic stop is legal." *Mosley*, 454 F.3d at 255. We agree with *Mosley*, and decline to impart a "factual nexus" test to the facts at issue herein, which are distinguishable from those in *Deluca*.

violation occurred. But the search of the vehicle in which Shabezz was a passenger is not the constitutional incident upon which we must focus in this case. The constitutional incident was the seizure, and that seizure was illegal. The only question, then, is the remedy. Shabezz need not demonstrate a second constitutional violation, *i.e.* an illegal search, to obtain suppression. He must demonstrate only that the evidence was obtained by police exploitation of the illegality. Despite the Commonwealth's assertions to the contrary, the Fourth Amendment does not require anything more before the subject of an illegal seizure is entitled to suppression.

## IV.

All that remains is the application of the fruit of the poisonous tree doctrine. Evidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by "exploitation" of the illegality, *see Wong Sun*, 371 U.S. at 486, and so long as the taint of that illegality has not been purged. The exploitation inquiry is readily satisfied. Shabezz was a passenger in a vehicle that was blocked in by numerous police vehicles. The police seized the vehicle, proceeded to search it, and uncovered contraband. The search occurred very shortly after the police prevented the vehicle from leaving the lot and arrested the four individuals. The discovery of contraband was a direct and immediate consequence of the seizure, and, thus, was an "exploitation" of the constitutional violation.

The record is devoid of any indicia that the taint of the illegal seizure was removed before the police searched the car and found evidence. None of the traditional circumstances that have been found to purge the taint of an unconstitutional act, *i.e.* attenuation, inevitable discovery, independent source, or some intervening act or event, *see Mosley*, 454 F.3d at 269, are present in this case. The search occurred minutes after the seizure, a lapse in time short enough to leave no viable argument that the

search was sufficiently attenuated from the seizure so as to purge the taint of the initial illegality. Additionally, although Shabezz briefly fled the scene and was chased by two officers, other officers remained with the vehicle and commenced the search immediately upon Shabezz' return to the scene. Nothing about Shabezz' brief flight from the scene broke the direct causal chain between the illegal seizure and the search of the vehicle.

Similarly, the flight itself was insufficient to purge the taint of the initial illegality. The flight was brief. Shabezz was apprehended within a few blocks of the 7-11 lot. A minimal amount of time passed between the seizure and Shabezz' subsequent apprehension. Those two events were not sufficiently attenuated from one another so as to break the chain of events flowing directly from the initial seizure. Flight, standing alone, does not *ipso facto* cure the illegality of a seizure. Indeed, in *Wong Sun*, co-defendant James Wah Toy fled from the police; the Supreme Court held that Toy's flight was insufficient to preclude application of the exclusionary rule. *Wong Sun*, 371 U.S. 482-84.

Consequently, all of the evidence found in the vehicle, and the evidence found on Shabezz' person, was a direct product, and, hence, an exploitation, of the initial illegality. The trial court and the Superior Court correctly concluded–albeit for slightly different reasons–that the entire bounty of evidence had to be suppressed under *Wong Sun*, and that no independent assessment of Shabezz' expectation of privacy was necessary before reaching this conclusion.

We affirm the Superior Court's order, and we remand this case to the trial court for further proceedings consistent with this opinion.

Chief Justice Saylor and Justices Todd, Donohue and Dougherty join the opinion.

Justice Mundy files a concurring opinion in which Justice Baer joins.