J-A02016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| LARRY CRAIG RICHARDSON, JR., | |
| Appellant. | No. 1291 WDA 2016 |

Appeal from the Judgment of Sentence, July 19, 2016,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s): CP-02-CR-0008374-2015.

BEFORE:  BOWES, J., OLSON, J., AND KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.                    **FILED MARCH 29, 2019**

Larry Craig Richardson, Jr. appeals from a judgment of sentence following a non-jury trial, where the court of common pleas found him guilty of drug-trafficking and driving under a suspended license.[1] The court sentenced Richardson to a prison term of five to ten years, followed by five years' probation. The police had searched Richardson's vehicle following a traffic stop and performed what they considered to be an inventory search. As our precedents make clear, this search was actually an investigatory search, conducted without a warrant and thus in violation of the Federal and Pennsylvania Constitutions. We therefore vacate the judgment of sentence and suppress the unconstitutionally seized evidence.

These are the facts:

_____

[1] 35 P.S. § 780-113(a)(30) and (16) and 75 Pa.C.S.A. § 1543(b)(1).

In 2015, the Pennsylvania Attorney General's Office and the Ross Township Police Department were investigating Richardson on suspicion of drug dealing. Officers had surveilled Richardson's residence at least three times. They were looking for people coming to his apartment to buy drugs or for Richardson to leave in his vehicle. After a few weeks, they still had no reliable informant or other source of information sufficient to create probable cause that Richardson was engaging in illegal drug activity. **See** N.T. Suppression Hearing, 1/21/16, at 72. And so they had no warrant.

What they did have was Richardson's driving record. By reviewing state databases, Officer Jason Moss knew that the Pennsylvania Department of Transportation had suspended Richardson's license stemming from a DUI.

The first surveillance occurred on March 17, 2015. No evidence of drug-trafficking manifested itself. Instead, Richardson got into his SUV with a trash bag and drove away. Officers pursued, but they did not cite him for the suspended license; and eventually, they lost him. The police located his parked SUV across town, but they did not try to cite him there. Three days later, officers staked out his apartment again. No evidence of drug dealing appeared.

On April 3, 2015, they resumed surveillance. Officer Balazs Devenyi sat in the apartment parking lot, in the back of an unmarked SUV. Officer Moss, who was also in an unmarked car, waited nearby where the roads out of the complex intersected with the public streets. At noon, Officer Moss asked Patrol Officer Mark Sullivan to position himself in the general area, in case they

- 2 -

needed assistance, so Officer Sullivan joined the surveillance team in a marked vehicle.

Three hours passed before Richardson left his apartment and entered his vehicle. Officer Devenyi radioed Officer Moss and Officer Sullivan to inform them that Richardson was on the move with some sort of black bag. Even though the police could have stopped him immediately for driving under suspension, they waited.

After Richardson drove approximately half a mile, he approached the interstate. Officer Moss directed Officer Sullivan to pull over Richardson. Officer Sullivan got directly behind Richardson and activated his lights to make the traffic stop.

Richardson saw the police officer's lights in his mirror, but he did not realize the officer was pulling him over. So he moved onto the berm of the entrance ramp and stopped. However, a portion of his vehicle remained in the lane of traffic. Officer Sullivan pulled his patrol car behind Richardson; Officer Moss arrived soon after.

Officer Moss asked Richardson to exit the SUV and gave him a traffic ticket for driving with a suspended license (a summary offense). Next, the officer decided that the vehicle's location required that it be removed from the lane of traffic. Per department policy, Richardson had a 20-minute window to move the vehicle. The police did not advise Richardson of this policy. Instead, Richardson asked if his girlfriend could move his SUV. Officer Moss asked if she was at the apartment complex Richardson had just left. Richardson said

- 3 -

no. So Officer Moss determined that no one was close enough to move the vehicle and ordered a tow.

Officer Moss then conducted what he considered to be an inventory search of the vehicle. When Officer Ross began his search, he did not have the department's standard inventory form with him. Upon entering Richardson's vehicle, the first thing that Officer Moss inventoried was the small black bag. As he had hoped, Officer Moss found exactly what he was searching for: 25 bricks of heroin and approximately 9 grams of cocaine. *See id.* at 71.

He immediately terminated the inventory search and had the vehicle towed to the police station. Based on the drugs found in Richardson's SUV, the police then obtained warrants to search his apartment and to search the vehicle more extensively. The police seized additional evidence.

Richardson moved to suppress all the physical evidence. The trial court denied his suppression motion, convicted Richardson, and sentenced him as mentioned above. This appeal followed.

Richardson raises two issues on appeal. Because it is dispositive, we only address the first issue:

> 1. Did the trial court err in denying Richardson's suppression motion because police conducted the search for criminal investigatory, rather than non-criminal inventory, purposes?

*See* Richardson's Brief at 5.[2]

Richardson argues that the police stopped him as pretext so they could search for drugs. *See* Richardson's Brief at 23-24. Richardson also notes that the officers never informed him that he had 20 minutes under police department policy to find someone else to remove his vehicle to avoid an inventory search altogether. *Id.* Lastly, he submits, because Officer Moss immediately searched his black bag and never properly completed an inventory form, the officers' real purpose was not to engage in a caretaking duty. Rather, their purpose was to complete the drug investigation. *Id*.

The Commonwealth perceives no constitutional violation, because the police officers followed departmental regulations for towing and inventorying an unlawfully parked vehicle. The Commonwealth argues that "although the police may very well have suspected the presence of criminal contraband in Richardson's vehicle, their suspicion does not refute the fact that the officers had lawful custody of the vehicle and began to conduct a legitimate inventory search . . . ." *See* Commonwealth's Brief at 29.

We begin by observing our standard of review:

---

[2] Richardson's second appellate issue is:

> 2. Did the trial court issue a manifestly excessive and unreasonable sentence that failed to properly consider and apply all of the relevant sentencing criteria, including the protection of the public, the gravity of the offense, and Richardson's character and rehabilitative needs, as required under 42 PA.C.S.A. § 9271(b) (Sentencing Generally)?

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Palmer*, 145 A.3d 170, 173 (Pa. Super. 2016) (citation omitted).

> However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Kemp*, 961 A.2d 1247, 1252–1253 (Pa. Super. 2008) (*en banc*) (citation omitted).

The facts before us are not disputed; thus, our review is confined to the suppression court's inferences and legal conclusions drawn from those findings. *See Commonwealth v. Germann,* 621 A.2d 589, 591 (Pa. Super. 1993) (citation omitted). Because this issue implicates constitutional requirements and is a question of law, our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Shabezz*, 166 A.3d 278, 285 (Pa. 2017).

Under well-accepted state and federal law, citizens are protected from unreasonable searches and seizures.

> The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, protect individuals from unreasonable searches and seizures. **See** U.S. Const. amend. IV; **see also** Pa. Const. art. 1, § 8.

**See Commonwealth v. Lagenella**, 83 A.3d 94, 102 (Pa. 2013)

Generally, law enforcement must obtain a warrant prior to conducting a search; however, there are certain exceptions to the warrant requirement. **Id.** (citation omitted). Observing the seminal case of **South Dakota v. Opperman**, 428 U.S. 364 (1976), our Supreme Court stated: "Inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment and are a recognized part of our law." **See Commonwealth v. Gatlos**, 76 A.3d 44, 54 (Pa. Super. 2013) (quoting **Commonwealth v. Nace**, 571 A.2d 1389, 1391 (Pa. 1990)).

Our Court detailed the extensive jurisprudence on warrantless inventory searches recently in **In Interest of M.W.**, 194 A.3d 1094 (Pa. Super. August 27, 2018):

> An inventory search is not designed to uncover criminal evidence. Rather, its purpose is to safeguard the seized items in order to benefit both the police and the defendant. We have recognized inventory searches in the two areas of automobiles and booking procedures.
>
> Four goals underlie such searches. First, they protect the defendant's property while he is in custody; second, police are protected against theft claims when defendants are given their property upon release; third, they serve to

- 7 -

protect the police from physical harm due to hidden weapons; and fourth, when necessary, they ascertain or verify the identity of the defendant. Intrusions into impounded vehicles or personal effects taken as part of the booking process are reasonable where the purpose is to identify and protect the seized items.

As long as the search is pursuant to the caretaking functions of the police department, the conduct of the police will not be viewed as unreasonable under the Constitution.

*In Interest of M.W*., 194 A.3d at 1100-1101. (citing **Commonwealth v. Gatlos**, 76 A.3d 44, 55–56 (Pa. Super. 2013)); ***see also Commonwealth v. Nace***, 571 A.2d 1389, 1391 (Pa. 1990) (internal citations omitted).

Specifically, we utilize a two-factor test to determine whether a warrantless inventory search is justifiable in the absence of probable cause.

An inventory search of an automobile is permissible when:

(1)   The police have lawfully impounded the vehicle; and

(2)   The police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle.

*See Lagenella*, 83 A.3d at 102 (citing ***South Dakota v. Opperman*** 428 U.S. 364, 375 (1976)).

Regarding the second prong, our Supreme Court explained:

The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and ***in good faith and not for the sole purpose of investigation***.

*Lagenella*, 83 A.3d at 103 (quoting ***Commonwealth v. Henley,*** 909 A.2d 352, 359 (Pa. Super. 2006) (*en banc*)) (citations omitted) (emphasis added).

To determine whether the search is for the sole purpose of investigation, we have explained: "Pennsylvania precedent unanimously agrees that the most important factor in evaluating [inventory] searches is the motive behind the search, and that the search is conducted pursuant to the objectives set forth by the United States Supreme Court in *Opperman*." *Gatlos*, 76 A.3d at 62. "[M]otive is the sole factor which distinguishes a criminal investigatory search from a noncriminal inventory search of an automobile." *In Interest of M.W.*, 194 A.3d at 1101 (citation omitted).

We also note that the inventory search exception is one of three distinct exceptions, which comprise the "community caretaker doctrine." *See Commonwealth v. Livingstone*, 174 A.3d 609, 626-27 (Pa. 2017).[3] Under this doctrine, in order to invoke the inventory search exception, the police action must be independent from the detection, investigation, and acquisition of criminal evidence. *Id*.

In the instant case, the suppression court drew erroneous legal conclusions from the facts. For the reasons we set forth below, we conclude that the inventory search was not reasonable. The police did not adhere to standard polices; the search was not conducted in good faith; and the purpose of the search was to discover evidence for a criminal drug investigation. Because this type of search requires a warrant, the police violated

_____

[3] "The community care doctrine has been characterized as encompassing three specific exceptions: the emergency aid exception; [] the inventory exception; and the public servant exception…." *Livingstone*, 174 A.3d at 626-27 (citation omitted).

Richardson's constitutional rights when they proceeded without one. Thus, the court erred when it did not suppress the evidence.

Richardson contends that almost every action the police took in this search underscored the investigatory motive. Although we may consider only the Commonwealth's evidence, we nevertheless agree with Richardson. As a matter of law, we conclude that the inventory search was not made in good faith, and its primary purpose was to discover evidence relating to the criminal narcotics investigation.

Richardson was the subject of a joint narcotics investigation and had been under surveillance for three weeks. As the suppression judge quipped, "I really don't think the Attorney General was involved to find out if Richardson was driving with a suspended license." **See** N.T. Suppression Hearing, 1/21/16, at 66. Officer Moss testified that his intentions were twofold: to stop Richardson for driving with a suspended license and to search for drugs.

> **Q:** [W]hen you were notified that he was carrying some sort of bag and entering the car, the real motivation at that point was to stop him for driving under suspension and hopefully find drugs on him at that time, correct?
>
> **A:** Yes.
>
> [...]
>
> **Q:** Your goal in stopping him for driving under suspension was, as you just said, hopefully to find him in possession of drugs most likely in that black bag.

> **A:** That was part of the investigation to include the DUI suspended (*sic*). So yes, it was part of the investigation.

*Id.* at 71-72.

The Commonwealth argues that the Officer's suspicion of drugs does not negate the legitimacy of the inventory search, because the stop was proper. After all, Richardson was unlawfully driving under a suspended license. Officer Moss maintained that the primary purpose of the stop was Richardson's suspended license, but he also conceded that the citation was a nice tool to have in the drug investigation.[4]

However, if the primary motivation was to prevent Richardson from driving under a suspended license, the police could have cited him at some point during the previous three weeks.

In fact, on the day in question, the police could have cited him immediately after he drove out his apartment complex. On cross-examination, Office Moss attempted to explain why he did not do so:

---

[4] **A:** [A]s part of my [drug] investigation, I determined that [Richardson was] DUI suspended (*sic*). So as part of that investigation, our motivation was to stop him when he's leaving because we have a duty to do that because he's DUI suspended. Now if he gets into an accident with somebody, he might leave the scene. So yes, it's nice to have that tool, but the motivation of that is the DUI suspended. So he was stopped for being DUI suspended.

*See* N.T. at 69.

**Q**:    You could have stopped [Richardson] right there and then for driving under suspension, correct?

**A:**    Correct.

**Q:**    But you didn't?

**A**:    Correct.

**Q:**    You allowed [Richardson] to continue driving down Cemetery Lane toward Route 19 so that eventually the only place he could be pulled over was on the on-ramp going down to 279 south?

**A:**    I didn't pull him over there. We intended to have the marked patrol vehicle stop him and that is why I didn't stop him.

**Q:**    You had the legal right and authority to pull him over as you were positioned in that location, correct?

**A:**    Yes, I did.

**Q:**    If you pulled him over in that location, obviously there would have been no need to tow his vehicle because he never would have left his residence, correct? You could have just given him the citation, had his vehicle remain in the private lot, and that would have been the end of it?

**A:**    No. It would be completely obstructing the whole apartment complex.

**Q:**    You could have ordered him to turn around, go back down where he came from, get out of his car and park his car, correct?

**A:**    I wouldn't put a DUI suspended driver back in the vehicle. What if he goes down there and wrecks his car and we just put a DUI suspended driver behind the wheel. I would tow the vehicle.

**Q:**    So instead of stopping [Richardson] right there and then at the intersection [immediately outside of the apartment complex], you let him continue to drive along Cemetery Lane putting at risk all those

motorists who are subjected to this DUI suspended driver?

**A:** That is true. However, there was a uniformed officer right there ready to stop him less than probably a quarter mile up the street.

[…]

**Q:** Well, was it a quarter of a mile or a half mile?

**A:** I would say a quarter mile to a half mile.

*See* N.T. Suppression Hearing, at 75-77.

By waiting until Richardson drove away from his apartment and toward the interstate, as short of a distance as it may be, Richardson's citation came at the most opportune time, and in a particularly convenient place, for the drug investigation.

The police pulled Richardson over on an interstate ramp. Had the police immediately prevented Richardson from leaving his apartment complex, or had they waited until Richardson could pull over legally, his vehicle might have only been subject to immobilization. Our Supreme Court recently held that an immobilized vehicle is not subject to an inventory search because it is not within the lawful custody of the police. *See Lagenella, supra,* 83 A.3d at 105-106 (holding that a "warrantless inventory search of a vehicle is permissible only when the police have lawfully towed and stored, or impounded the vehicle."). Because the police waited to cite Richardson, they ensured that they met the first prong of the inventory search analysis: 1) the police have lawfully impounded the vehicle. *See id.* at 102.

- 13 -

We also observe that the police did not abide by standard policies. Officer Moss failed to inform Richardson of the Ross Township Police Department's policy to allow unlawful drivers 20 minutes to find a substitute driver to avoid having their car towed and inventoried. Richardson had voluntarily asked Officer Moss if Richardson's girlfriend could remove his car from the berm. Officer Moss asked if she was at the apartment.[5] *See* N.T. Suppression Hearing, at 49. Richardson said no. Without advising Richardson that he had 20 minutes to find anyone else, Officer Moss decided that whomever Richardson could possibly call would not be there in time. Officer Moss then ordered the tow and proceeded with the search.

The police ignored other aspects of their department policy. The purported inventory search began without the standard inventory form. Officer Moss testified that he often fills out the official form back at the station, because he will jot down the inventoried items in a notebook. *Id.* at 89. But, here, he did not do that either. Only after the fact, and despite the officer never finishing the inventorying, did Officer Moss fill out a purported inventory form. Notably, Officer Moss did not list on that form several valuable items in the vehicle. He also failed to record the presence or absence of preprinted items listed on the inventory form, like a spare tire, a jack, and a lug wrench.

---

[5] We observe that later in the suppression hearing, Officer Moss disputed his earlier testimony and stated that he could not recall if his response to Richardson was whether the girlfriend was at the apartment or whether he asked Richardson if she was "close by." *See* N.T. Suppression Hearing, at 81-83.

As we referenced above, four goals underpin the inventory search exception: 1) to protect the defendant's property while he is in custody; 2) to protect the police against claims of theft; 3) to protect the police from physical harm due to hidden weapons; and 4) when necessary, to ascertain identity.

We immediately recognize that the first, second, and fourth goals do not apply here. Officer Moss had no need to seize and search that bag to protect Richardson's property or to protect the department against claims of theft. To accomplish those goals, Officer Moss could have just given the bag to Richardson, because Richardson was not in custody. Likewise, the police had no need to search the black bag to ascertain Richardson's identity.

As to the remaining goal – the officers' self-protection – no testifying officer articulated with any sort of specificity how searching the contents of the small bag ensured their physical safety. Officer Moss only discussed the inventory policy in a general sense:

> **A:** That is the policy. You have to inventory the vehicle to protect ourselves and the [tow-truck operator] of potential liability of items of value that are in the car and are potentially stolen either by us or the tower. So we cover ourselves and document everything of value in the vehicle.
>
> [...]
>
> **Q:** This inventory policy is to protect the valuable items of the owner of the vehicle that is now being released out of police custody?
>
> **A:** To protect him, to protect us, to protect the [tow-truck operator].

N.T. Suppression Hearing, at 54; 57.

- 15 -

An inventory search, by definition, is not designed to uncover criminal evidence. But the first and only thing that Officer Moss inventoried in Richardson's car was the small, black bag. After all, the presence of the black bag was what caused the police to mobilize and stop Richardson on **this** occasion. They had prior opportunities to stop Richardson from driving with a suspended license, but they did nothing. The black bag highlights the search's investigative motive.

Compare the instant case to **Commonwealth v. Collazo**, 654 A.2d 1174, 1177 (Pa. Super. 1995), where we deemed proper an inventory search conducted in light of a drug investigation:

> In **Collazo**, officers placed the appellant under arrest for possessing a controlled substance with intent to distribute after they observed the appellant sell a confidential informant sixteen packs of heroin […]. After arresting the appellant, the officers sought to impound his vehicle.
>
> Although the appellant asserted he owned the vehicle, it was registered to another individual and the vehicle's VIN number was illegible. The officers then searched the vehicle's glove compartment for the registration papers of the owner and discovered a packet of heroin with the same label that appeared on the heroin that the appellant had sold the informant.
>
> On appeal, this Court found the officers had conducted a valid inventory search when they opened the vehicle's glove compartment:
>
> > […]
>
> > [T]he vehicle had been seized by police after appellant's arrest for selling heroin to the informant. The **motive** for the subsequent search of the vehicle was solely to identify its owner and not to uncover evidence of crime. The search, therefore, was within the caretaking function

> of the police, and, as such, was properly conducted without a warrant.
>
> ***Collazo***, 654 A.2d at 1177.

***In Interest of M.W.***, 194 A.3d at 1101 (discussing ***Collazo***, ***supra***) (emphasis added).

In ***In Interest of M.W.***, the police stopped an appellant whose vehicle rolled through a stop sign. The teenaged appellant stated he did not have a driver's license, and he did not produce the car's registration.

> Officer Seymour asserted that he told appellant that he was being detained [in the back of the police cruiser] so the officers could determine the ownership of the car. […]
>
> Appellant informed Officer Harris that the vehicle's documentation was in the glove compartment of the vehicle.
>
> Officer Seymour subsequently opened the glove compartment, in which he discovered a Ziploc bag containing fourteen plastic jars of marijuana.

***Id.***, 194 A.3d at 1096-1097.

In both cases, we concluded that "the officers' ***motive*** for searching the glove compartment was solely to identify the owner of the vehicle and not to uncover evidence of a crime. As a result, the officers lawfully conducted a proper inventory search…." ***Id.***, 194 A.3d at 1101 (emphasis added). In these instances, we concluded that the search was reasonable because the police operated in good faith, and the purpose of their search was based on one of the four recognized non-investigatory goals – namely, identification.

In the instant case, not only did Officer Moss depart from following standard procedures, but the motivation to search the black bag cannot be traced to one of the four goals of an inventory search.

In the absence of one of the four good-faith rationales, we are even more inclined to infer that the search was conducted for investigatory reasons. Consider **Commonwealth v. Landamus**, 482 A.2d 619 (Pa. Super. 1984). In **Landamus**, the police impounded the appellant's parked car, after the car – though not the appellant – was identified in a burglary. The police then conducted an inventory search. They discovered jewelry. We stated:

> We can draw no other conclusion than police had a motive to search for evidence when they seized the car. ***The major obstacle to the success of the Commonwealth's argument that this was a valid inventory search is that the officers applied for a warrant to search the vehicle for evidence after they discovered the jewelry in the car.*** This strongly indicates that the motive behind their actions was to secure evidence against the Appellant.

**Landamus**, 482 A.2d at 623 (emphasis added).

The same events occurred here. Upon discovering drugs in Richardson's black bag, the police halted their purported inventory search. They immediately obtained warrants to conduct extensive searches of both the vehicle and Richardson's residence, which had been under surveillance. As we inferred in **Landamus**, these actions strongly indicate the true purpose of the search was not to inventory the vehicle's contents but to search for drugs.

We also draw no other legal conclusion than the police had an investigatory motive to search for evidence when they conducted their search.

The inventory search was not independent of the narcotics investigation. As such, the Commonwealth fails the second prong of the inventory search analysis: 2) the search was not reasonable. *See Lagenella*, 83 A.3d at 102.

Because the automobile search was illegal, the additional evidence derived from Richardson's black bag must also be suppressed. *See Shabezz*, *supra*, 166 A.3d at 287 (holding "evidence derived from an illegal automobile search constitutes fruit of the poisonous tree as a result of the illegal seizure (unless the taint is removed)"); *see also Wong Sun v. United States*, 371 U.S. 471 (1963).

The learned Dissent recognizes the above precedents concerning inventory searches, but believes we misapply them in light of our Supreme Court's recent decision in *Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017). We disagree, because we respectfully opine that the Dissent applies related, but distinct, principles of the public servant exception to its inventory search analysis.

In *Livingstone*, the Supreme Court of Pennsylvania undertook an extensive review of the *public servant* exception to the warrant requirement. The public servant exception, the inventory search exception, and the emergency aid exception all fall under the same umbrella: the "community caretaking doctrine." *See id.* at 626-627; *see also, e.g., In Interest of M.W.*, *supra*, 194 A.3d at 1100-1101 ("As long as the search is pursuant to the *caretaking functions* of the police department, the conduct of the police

will not be viewed as unreasonable under the Constitution.") (emphasis added).

In *Livingstone,* a state trooper believed that a driver who parked along an interstate required emergency assistance. He pulled his cruiser in front of the driver's car, approached the driver, and discovered that she was glossy-eyed. He then administered a breathalyzer test and charged her with driving under the influence. The trooper had no warrant to conduct the search and seizure. Because the trooper could not articulate specific and objective facts to suggest that that the motorist required assistance, the Supreme Court determined that the Commonwealth could not rely upon the public servant exception to the warrant requirement.

The *Livingstone* Court ruled that the applicability of the public servant exception depends on three essential factors:

> [1)] the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed;
>
> **[2)] the police action must be independent from the detection, investigation, and acquisition of criminal evidence**; and,
>
> [3)] based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril.

*Livingstone*, 174 A.3d at 637 (emphasis added).

The *Livingstone* Court observed – and the Dissent highlights – the second factor is the common thread sewn through the entire caretaking

doctrine – not only through public servant exception, but also through the inventory search exception and emergency aid exception. ***See id.*** at 635. Thus, the second factor in ***Livingstone*** must be considered when conducting an inventory search analysis; we ask: (2) was the police action ***independent from*** the detection, investigation and acquisition of criminal evidence?

For the Dissent, the question becomes how to define "independent from." The Dissent would look to the first ***Livingstone*** factor to interpret the phrase "independent from." ***See*** Dissent at 26. And so, in the Dissent's application, the search is legitimate because: even though the police had an investigatory interest (Richardson's black bag likely had evidence pertinent to the drug investigation), this interest merely coincides with ***specific, objective, independent*** reasons for searching the vehicle (Richardson's suspended license necessitated that his car be impounded, which in turn, necessitated an inventory of the vehicle's contents). ***See id***. at 31-32.

We view this as a misapplication, because the first ***Livingstone*** factor is specific to the public servant exception analysis and does not belong in the inventory search analysis. No authority has mandated that we apply the "specific, objective, and independent facts" test to an inventory search.

We certainly do not believe that ***Livingstone*** meant to make the inventory search analysis mirror the public servant analysis, nor do we believe that ***Livingstone*** silently refined the inventory search jurisprudence.

To explain: when the ***Livingstone*** Court addressed the community caretaking exception, the Court noted that it already ruled on the inventory

search exception, but that it had not yet addressed the two other exceptions in the community caretaking doctrine:

> In **Commonwealth v. Lagenella** [**supra**], 623 Pa. 434, 83 A.3d 94, 103 (2013), this Court acknowledged the "community care-taking functions" of police when we considered the legality of an inventory search of a vehicle lawfully impounded pursuant to standard police policy**. We have not, however, addressed the public servant or the emergency aid exceptions under the community caretaking doctrine**, although more than half of our sister states have done so.

**Livingstone**, 174 A.3d at 627 (emphasis added).

The **Livingstone** Court proceeded to discuss, in great detail, other facets of the community care taking doctrine thereafter, but it never revisited its four-year-old inventory search holding in **Lagenella**. Moreover, the **Livingstone** Court specifically limited its holding to the public servant exception.[6]

---

6

> **[We] first hold that, in order for the public servant exception of the community caretaking doctrine to apply**, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance.
>
> * * *
>
> **Second, we hold that, in order for the public servant exception of the community caretaking doctrine to apply**, the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence. [T]his is a common requirement to warrantless

- 22 -

Neither can we ignore this Court's recent decision in *In Interest of M.W.*, *supra*, 194 A.3d 1094 (Pa. Super. 2018), where we conducted an inventory search analysis without even mentioning *Livingstone*. After all, it is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court, except of course, in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court. *See Commonwealth v. Postie*, --- A.3d ---, 2018 WL 6580528 (Pa. Super. December 12, 2018) (*en banc*) (citing *Commonwealth v. Pepe*, 897 A.2d 463, 465 (Pa. Super. 2006)), *appeal denied*, 946 A.2d 686 (Pa. 2008).

When we apply *Livingstone*, we must be careful to apply only that which is applicable to the entire community caretaking doctrine. When doing

_____

searches under all three exceptions of the community caretaking doctrine[…].

* * *

[I]t is not realistic or wise to expect an officer to ignore the nature of his or her role in law enforcement—or its inherent dangers—*in order for the public servant exception of the community caretaking doctrine to apply*.

* * *

*Finally, we hold that, in order for the public servant exception to apply,* the level of intrusion must be commensurate with the perceived need for assistance....

*Livingstone*, 174 A.3d at 634–637 (emphasis added).

so, we conclude that the police overreached in this matter. The ***Livingstone***

Court cautioned:

> When the community caretaking [doctrine] is involved to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse.

***Livingstone***, 174 A.3d at 637 (citation omitted).

Instantly, when the police stopped and cited Richardson, the inventory was ***not*** independent from the narcotics investigation.

These officers' ***primary*** concern when they looked into Richardson's driving record was to enforce the anti-narcotics statutes. It was their ***primary*** concern when they staked-out his apartment for three weeks. And it was their ***primary*** concern when they ordered his vehicle to be towed and searched his black bag. We cannot validate this search merely because Officer Moss testified that it was his duty to protect motorists from Richardson's unlawful driving. ***See*** N.T. Suppression Hearing, at 69. This testimony does not salvage the search, which was not conducted in accordance with standard procedures, nor in good faith.

Inventory searches of automobiles, by definition, are not part of a criminal investigation. Only by separating inventory and investigative searches can the judiciary ensure that the community caretaker doctrine does not become a tool for criminal investigators to circumvent the constitutional rights of individuals. When considering all the facts and circumstances, we conclude that this search was a part of law enforcement's drug investigation

- 24 -

into Richardson. The search fails the second prong of the inventory search analysis; thus, it was not an inventory search at all. It was an investigative search, without probable cause and without a search warrant. The subsequent search of his home and the more extensive search of his vehicle were similarly unlawful, because they stemmed from the unconstitutional vehicle search. We reverse the order denying Richardson's suppression motion, vacate his judgment of sentence, and remand.

Judgment of sentence vacated. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Bowes concurs in the result.

Judge Olson files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2019