J-A11024-18 & J-A11025-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAMIEN OMAR SEALS | : | No. 1352 MDA 2017 |

Appeal from the Order Entered July 25, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000725-2017

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHALON JABRYLLE DEAN | : | No. 1353 MDA 2017 |

Appeal from the Order Entered August 7, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000907-2017

BEFORE:   STABILE, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 30, 2018**

The Commonwealth appeals[1] from the orders granting the motions to suppress evidence filed by Appellees Damien Omar Seals and Shalon Jabrylle

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** Pa.R.A.P. 311(d).

Dean.[2]  The Commonwealth claims the trial court erred in concluding that there was no basis to detain and search the vehicle in which Appellees were traveling.[3]  Additionally, the Commonwealth claims that the court erred in suppressing the evidence discovered in the vehicle when Appellees lacked a reasonable expectation of privacy in the vehicle and the search of the vehicle was supported by reasonable suspicion.  We conclude that the Commonwealth failed to establish that the traffic stop was reasonable under the circumstances of this case and therefore affirm the trial court's order.

The Commonwealth presented the following evidence at the suppression hearing regarding the detention of Appellees.  Officer James Boas testified that on January 25, 2017, he was on duty with the Selective Enforcement Unit (SEU) of the Lancaster City Police Department.  N.T., Suppression, 7/25/17, at 7.  Both he and his partner, Officer Steven Reich, were working undercover on a "buy/walk" detail.[4]  *Id.* at 8.

At approximately 3:45 p.m., Officers Boas and Reich were walking south on Queen Street and then turned east onto the 500 block of Howard Avenue.  At that time, Officer Boas testified that he heard loud music coming from

---

[2] Because these appeals regard the same facts and raise identical legal issues, they have been consolidated for the purpose of disposition.

[3] The Commonwealth's claims have been reordered for the purposes of this disposition.

[4] In a "buy/walk" detail, SEU utilizes undercover police officers to make drug buys from subjects throughout Lancaster City.  *See* N.T. at 7.  The SEU detail began at 12:00 or 1:00 p.m. that day.  *Id.* at 14.

further down the block. *Id.* at 8. The officers determined that the music was coming from a gray Mazda 3 sedan (the Mazda) parked on the south side Howard Avenue. *Id.*

Officer Boas estimated that the Mazda was approximately 100 feet away when he first heard the music. *Id.* at 11. The officers walked by the Mazda and recognized two of the occupants, Appellee Seals, who was in the front passenger seat, and Maurice McNeil, who was the rear driver side passenger, as "known drug dealers." *Id*. at 5, 9, 11, 20. Officer Boas testified that after walking past the Mazda, he could still hear the music from a distance of 200 feet. *Id.* at 12.

Officer Boas testified that Officer Reich was wearing a wire transmitter, which relayed the officers' conversations to their primary surveillance officer. *Id.* at 9. According to Officer Boas, he and Officer Reich used the transmitter to provide information that they "heard loud music, ordinance violation, coming from the Mazda . . . ." *Id.* Officer Reich reported "the location of the vehicle, the known occupants of the vehicle, and the description of the vehicle." *Id.*

Officer Boas explained that he and Officer Reich reported the noise ordinance violation because it was

> a quality of life issue which is part of what we address. We weren't able to buy any drugs from any subjects on the street at that time. There was nobody out in the block so we just g[a]ve [the surveillance officers] that information, you know, let them know that there [was] a noise ordinance violation in the area and g[a]ve them the determination of whether they want[ed] to stop the

vehicle or not or they want[ed] us to continue to try and find subjects to purchase drugs from.

*Id.* at 11.

On cross-examination, when asked whether he directed backup officers to the Mazda to search for drugs, Officer Boas testified:

I just want to make it clear that I did not direct them to stop anyone that day. I simply -- or Officer Reich actually simply advised the primary surveillance officer of the noise ordinance violation and we gave them the description of the vehicle and where it was parked. That's what we did. We didn't tell anyone to stop anybody, myself or Officer Reich.

*Id.* at 15. On redirect examination, Officer Boas again explained that he did not direct other officers to stop the vehicle because he recognized two of the occupants as drug dealers.[5] *Id.* at 19-20.

Sergeant Anthony Weaver testified that he was assigned to the SEU detail in a "contact or arrest car" with his partner Detective Thomas Ginder. *Id.* at 23. Sergeant Weaver and Detective Ginder's vehicle was a marked police vehicle and both were in full uniform with their badges on display. *Id.* at 23. Sergeant Weaver and Detective Ginder were parked "a ways out" from the 500 block of Howard Avenue. *Id.* at 26. Detective Ginder was driving the police vehicle.

Sergeant Weaver testified that around 3:45 p.m., he and Detective Ginder received radio transmission from an SEU officer reporting that a vehicle

---

[5] The Commonwealth did not present evidence at the suppression hearing supporting the allegation that Appellee Seals and McNeil were "known" drug dealers.

- 4 -

violated the Lancaster City noise ordinance and requesting that they "stop that vehicle." *Id.* at 25. According to Sergeant Weaver, the report indicated that there "were two subjects that were known to them as drug dealers" inside the car. *Id.* at 26. Sergeant Weaver testified that the information relayed about the two occupants "was purely an officer safety recommendation to us at that point."[6] *Id.*

Sergeant Weaver testified that after receiving the broadcast, Detective Ginder began driving towards the 500 block of Howard Avenue, but traffic was extremely heavy. Sergeant Weaver stated that he and Detective Ginder received information that "the Mazda was on the move" and were "directed to the movement of that vehicle." *Id.* at 48. Detective Ginder caught up to the vehicle on the 500 block of East King Street. *Id.* On cross-examination, Officer Weaver noted that he did not "see the car" until "entering the 500 block of East King" but knew where the Mazda was because "[i]t was being followed by a surveillance vehicle." *Id.*

Sergeant Weaver described the following "red flags" after observing the Mazda on the 500 block of East King Street. First, Sergeant Weaver testified that after locating the Mazda on East King Street, Appellee Dean, who was in

---

[6] Specifically, Sergeant Weaver explained that the "officer safety recommendation" meant that "those suspects engaged in dealing narcotics are often armed, are often involved in violent crime, and SEU was aware that these subjects were involved in drug dealing and wanted to advise us of that . . . for our safety during the stop." N.T. at 27. However, he stated that the SEU officers did not tell them to approach the vehicle because there were known drug dealers inside. *Id.* at 27.

the rear passenger seat of the Mazda, turned around and looked at the police vehicle. *Id.* at 28. Immediately thereafter, the Mazda veered from the left lane to the right travel lane and then to a spot along the right curb. *Id.* at 28. Sergeant Weaver explained that in his experience, "subjects who are engaged in criminal activity try[] to park quickly when police are observed behind them." *Id.* at 28.

Second, after pulling in behind the Mazda, Sergeant Weaver explained:

> As we pulled in behind the vehicle which was now illegally parked in a no parking zone, I observed the two backseat passengers, that being again, [Appellee] Dean and the left rear passenger [McNeil], both of them made movements in the backseat that concerned me. These were movements to the slight left, slight right and shoulders rising and dipping.

> Again, I've seen those types of movements out of suspects who are armed during vehicle stops. I personally observed movements like that and have recovered handguns off of subjects, and those types of movements when you have a move to the left or the right and shoulders dipping up and down is indicative of a subject who is armed either removing or placing a handgun into a waistband or pocket.

*Id.* at 29.

Third, Sergeant Weaver testified that Appellee Seals, the front passenger, opened his door, which prompted Sergeant Weaver to "forcefully direct[]" Appellee Seals to close the door and remain inside the vehicle. *Id.* Sergeant Weaver testified that in his "nearly 17 years of experience, [he] observed that type of activity from suspects, again, who are engaged in criminal activity. Usually what this means is the suspect is trying to get away

from some sort of contraband or items that they want to separate themselves from." *Id.*

Based on these "red flags" and his experience, Sergeant Weaver testified he had "an extreme level of concern." *Id.* at 27. He also stated that he "was fairly certain and concerned that there was a handgun in the car." *Id.* at 30. Sergeant Weaver testified that these "red flags" caused "enough concern that when we stopped the vehicle and I exited, I actually pulled my duty weapon." *Id.* at 28.

Sergeant Weaver testified that he held his firearm at his chest with the weapon pointed downward in a "safety circle." *Id.* at 28-29. Furthermore, based on his concerns, he positioned himself with a telephone pole between himself and the Mazda and directed Detective Ginder to "watch the backseat." *Id.* at 29. Sergeant Weaver testified that he did not hear any music coming from the Mazda when following the Mazda on East King Street, or immediately after the stop. *Id.* at 27.

The Commonwealth also played a portion of the audio and video recordings from the motor vehicle recorder (MVR) on Officer Weaver's vehicle and admitted the entire recordings into evidence as Commonwealth's Exhibit 1 (Exhibit 1). The recordings included video of the initial pursuit of the Mazda, video and audio of the detention and search of the Mazda, and audio of Appellees' arrests at the scene.

As to the detention, Exhibit 1 revealed the following.[7] Sergeant Weaver and Detective Ginder[8] were parked along the right curb of a one-way road. The roadway had two traveling lanes and a third lane for parking along the right curb. The officers moved from the right parking lane to the right travel lane and drove straight for approximately two to two and a half blocks in the right travel lane.

Thereafter, the Mazda first clearly appeared on the video when, at or near an intersection, it moved from the right lane to the left lane in front of Sergeant Weaver's vehicle. At that point, there were approximately four cars in the right lane between Sergeant Weaver's vehicle and the Mazda. Detective Ginder moved to the left lane. Once the officers moved into the left travel lane, there were no cars between their police vehicle and the Mazda.[9]

Detective Ginder followed the vehicle in the left lane and closed the distance to the Mazda slightly, passing one of the four cars that had been between the police vehicle and the Mazda in the right lane.[10] Both the police

---

[7] The MVR recording is time-stamped and starts at 15:49:36.

[8] It appears from the MVR recording that Detective Ginder was wearing a tactical vest marked "Police" and that Sergeant Weaver was wearing a jacket labelled "Police."

[9] **See** Ex. 1 at 15:50:16.

[10] There were irregular spaces between the four other cars in the right lane, and there was no testimony regarding a more exact distance between the police vehicle and the Mazda.

vehicle and the Mazda traveled in the left lane for approximately ten seconds, after which the Mazda began moving into the right lane.[11]  Exhibit 1 did not show Appellee Dean, who was in the rear passenger-side seat, looking back at the police vehicle.  When the Mazda moved into the right travel lane, Detective Ginder pulled into the right travel lane, remaining approximately three car lengths away from the Mazda.

The Mazda next appeared along the right curb in front of a store.  The Mazda was in the right parking lane, but that section of the lane was posted as no parking.  The Mazda was reversing as Detective Ginder pulled behind it.  The emergency lights of the police vehicle were activated as the subject vehicle was braking,[12] and the police vehicle came to a complete stop just behind the subject vehicle as the Mazda was coming to a stop.[13]  The driver's window of the Mazda was already approximately two-thirds of the way down as the Detective Ginder pulled behind it.  No music could be heard when the audio portion of the recording began.

As noted above, Sergeant Weaver testified that based on the "red flags," he exited the police vehicle as it stopped, drew his service weapon, and

_____

[11] **See id.** at 15:50:26.

[12] **Id.** at 15:50:36.  The police vehicle first pulled in behind the Mazda by the right curb at around 15:50:33.

[13] **Id.** at 15:50:40.

positioned himself with a telephone pole between himself and the Mazda. Exhibit 1 suggested that approximately ten seconds after Detective Ginder pulled into the far right non-travel lane behind the Mazda, Sergeant Weaver was heard stating, "[W]atch the backseat."[14]   However, there was little indication in Exhibit 1 that the rear passengers were shifting their shoulders after Detective Ginder pulled behind the Mazda along the right curb.

Approximately five seconds after Sergeant Weaver's warning to "watch the backseat," the front passenger door opened.  Sergeant Weaver was heard commanding Appellee Seals to "stay in the car" and close the door.[15]

Approximately twenty seconds after Sergeant Weaver directed Appellee Seals to stay in the car, Detective Ginder appeared in the video behind the Mazda and used his radio to call in the license plate and description of the Mazda.[16]  Approximately ten seconds after calling in the information and fifty seconds after pulling in behind the Mazda, Detective Ginder approached the vehicle on the driver side.[17]  Sergeant Weaver approached on the passenger side.[18]

_____

[14] *Id.* at 15:50:43.

[15] *Id.* at 15:50:48.

[16] *Id.* at 15:51:10.

[17] *Id.* at 15:51:20.

[18] *Id.*

Sergeant Weaver ordered the backseat passengers to put their hands on the headrests[19] and the front seat passenger to put his hands on the dashboard.[20] Sergeant Weaver told the occupants, "[Y]ou guys were moving around way too fucking much."[21] At that point, Detective Ginder was standing by the rear wheel of the Mazda on the driver side, and Sergeant Weaver was at the rear wheel of the Mazda on the passenger side.

Detective Ginder was then heard speaking to the driver of the Mazda. The detective stated that the driver improperly changed lanes in the middle of an intersection. A voice apparently from the Mazda indicated, "I was just going to the store." Sergeant Weaver responded, "We'll figure it out. When we were pulling you over, you guys were moving all around making me nervous."[22] Detective Ginder then approached the driver door and began collecting paperwork from the driver through the driver's window.[23] Shortly thereafter, the rear driver-side window was rolled down approximately half way, and additional paperwork was passed through the rear driver-side window.

_____

[19] *Id.* at 15:51:21.

[20] *Id.* at 15:51:25.

[21] *Id.* at 15:51:28.

[22] *Id.* at 15:51:57.

[23] *Id.* at 15:52:11.

Sergeant Weaver was heard asking for "one more here."[24]   A third officer, wearing a vest labeled "Police K-9," appeared in the video.  Based on the video and Sergeant Weaver's testimony, the first K-9 officer on the video recording was Officer Alexander.[25]

The three officers in the video—Sergeant Weaver, Detective Ginder, and Officer Alexander—stood by the rear of the vehicle waiting for backup. Sergeant Weaver was then heard stating "I want to pull them all out"[26] and to "pat down all of them."  Three officers approached the vehicle as a fourth officer, also wearing a "Police K-9" vest, appeared on the edge of the recording.

The officers then began the process of removing each occupant from the car, frisking them, and placing them on the curb one at a time.[27]  This process included a police officer opening the door, and having the occupant of the Mazda step out backwards with his hands on his head.  The officer would then use one hand to hold the occupant's hands on top of the occupants' head and walk the occupant backwards towards Sergeant Weaver's vehicle.  The officer

---

[24] *Id.* at 15:52:17.

[25] Officer Alexander's first name was not referenced in the record.

[26] *Id.* at 15:54:32.

[27] *Id.* at 15:55:02.  Sergeant Weaver estimated that a total of six officers were at the scene when the process of removing the occupants of the Mazda began.  N.T. at 41.

would then continue to hold the occupant's hands on the occupant's head while frisking the occupant with his free hand, then move the occupant to the curb outside the view of the MVR. At all times, a second officer was in close proximity to the officer removing and frisking the occupant. The occupants were removed from the vehicle in the following order: (1) rear driver side passenger, (2) driver,[28] (3) rear passenger side passenger, Appellee Dean,[29] and (4) front passenger, Appellee Seals.

As to the search of the Mazda, the Commonwealth presented the following evidence at the suppression hearing. Sergeant Weaver testified that he initially planned to conduct a protective sweep of the Mazda for a weapon. N.T. at 34. However, Sergeant Weaver stated that he smelled an odor of burnt marijuana as the officers were removing the occupants of the Mazda. *Id.* at 34.

Officers closed all of the doors of the Mazda, and Officer Alexander and his canine partner then walked around the exterior of the Mazda. Officer Alexander then opened the front door of the Mazda and placed his canine partner inside the car. At some time during this process, the canine "hit" on the center console. Sergeant Weaver and Officer Alexander then entered the

---

[28] During the frisk of the driver, an officer recovered a pocket knife. Ex. 1 at 15:57:08; N.T. at 50.

[29] Appellee Dean was found to be in possession of "plastic corner tie bag containing crack cocaine." *See* Aff. of Probable Cause, CP-36-CR-0000907-2017, 1/25/17. It is not clear from the record when or where the cocaine was recovered from Appellee Dean and there is no indication in Exhibit 1 that the police discovered the cocaine during the frisk.

vehicle and recovered a bag and a grinder from the center console and forty bags of heroin under the front passenger seat.

Appellees were arrested as a result of the detention and search and charged with possession with intent to deliver and conspiracy. Appellees Seals and Dean filed omnibus pretrial motions on April 3, 2017, and May 10, 2017, respectively. Appellees asserted that the initial detention of the vehicle was unlawful and tainted the discovery of the contraband inside the vehicle. *See* Appellee Seals' Omnibus Pretrial Mot., 4/3/17, at 1-2; Appellee Dean's Omnibus Pretrial Mot., 5/10/17, at 2-3.

The trial court held a hearing on both motions on July 25, 2017, at which the Commonwealth presented the evidence summarized above. Appellees did not testify or present evidence at the hearing.

In the arguments on their motions to suppress, counsel for Appellees argued that the stop and detention of the Mazda was pretextual. N.T. at 52-53. Counsel for Appellee Seals also noted that the alleged furtive movements and nervousness did not justify the seizure of Appellees. *Id.* at 52. Counsel for Appellee Dean added that the backup officers unnecessarily extended the stop beyond the stated purposes of the stop. *Id.* at 53-54.

The Commonwealth responded that Appellees did not have a reasonable expectation of privacy in the vehicle. *Id.* at 54. Moreover, when asked for the basis of the seizure by the trial court, the Commonwealth engaged in the following exchange with the court:

[Commonwealth's counsel]: . . . You have probable cause because of the noise ordinance. So the police go to the vehicle because of [probable cause] of the noise ordinance, which is a city ordinance.

THE COURT: I'll grant you that they have a basis for pulling the vehicle over for the noise ordinance. My question is, when does this all morph into probable cause to do all of the rest of the things?

[Commonwealth's counsel]: Well, it morphs into reasonable suspicion which then becomes probable cause based on the marijuana.

THE COURT: Well, based on that, where does it morph into reasonable suspicion?

[Commonwealth's counsel]: That is when Detective Ginder and Sergeant Weaver are in the car following the Mazda and they see the furtive movements and the dipping, the shoulders dipping and the movement in the backseat.

And you heard Sergeant Weaver testify that based on his training and experience, he knows that that is probably indicative of criminal activity because he knows they're drug dealers.

Drug dealers, based on his training and experience, usually carry weapons. What are these people doing in the backseat? They're making furtive movements which are consistent with the police knowing that these are known drug dealers and making their furtive movements. That turns into reasonable suspicion.

*Id.* at 57-58.

In further exchanges with the Commonwealth, the trial court dismissed Sergeant Weaver's opinion that the Mazda took evasive action when it moved from the left travel lane of East King Street to the right curb:

THE COURT: How is that evasive? I mean, that -- I heard Officer -- [S]ergeant Weaver testify to that. I don't see that there's anything evasive about that whatsoever. As soon as they see there's a police car behind them, they pull over to the right and stop. How is that evasive?

- 15 -

[Commonwealth's counsel]: The lights weren't on on a marked police car.

THE COURT: I didn't say they were on. You're saying that's somehow evasive. Evasive is trying to elude these police officers, and that conduct is anything but, as I see it.

*Id.* at 59. Additionally, the trial court indicated that the fact that Appellee Seals opened the front passenger-side door was not suspicious. *Id.* ("And that's questionable for some reason? How many times have drivers done the same thing? You've seen it, I've seen it. That's not at all an uncommon reaction.")

At the conclusion of the hearing, the trial court suggested that the basis for the stop was the information that there were two known drug dealers in the Mazda. *Id.* at 61. The trial court granted Appellees' suppression motion. The court asserted that it did "not find justification for the stop made in this situation, [and] certainly not for the search which ensued." *Id.* at 61.

The Commonwealth timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion requesting that its ruling be affirmed.

In its Rule 1925(a) opinion, the trial court suggested:

Here, it is clear that the police had neither reasonable suspicion to[] stop the car, nor probable cause to search the car. The initial stop of the vehicle seemed to be predicated on an alleged noise violation, and the fact that two of the passengers in the vehicle were recognized by the officer as known drug dealers. Officer Boas testified that he heard loud music coming from the . . . vehicle in violation of city ordinance 198-4(B)(1)(b) while working a walking detail in an undercover capacity. He and his partner relayed the information to the primary surveillance officer. The actual vehicle

stop occurred eight to ten blocks away from where Officer Boas first heard the noise violation.

The officer who made the vehicle stop, [Sergeant] Weaver, testified that he was "contacted via radio and advised to stop a vehicle which had violated a city noise ordinance, and that there were two passengers in the vehicle that were known drug dealers." [Sergeant] Weaver further testified that he did not hear any music from the car, but continued to follow the vehicle until it pulled over to the side of the road." [Sergeant] Weaver said that he was concerned because of passenger behavior that raised "red flags", specifically movements that he believed were indicative of a person who is armed either removing or placing a handgun into a waistband or pocket. The original intent of the stop was to give the driver a citation for violation of the noise ordinance, but based on these "red flags"; [Sergeant] Weaver drew his weapon, called for backup and removed the passengers. [Sergeant] Weaver further testified that he never informed the passengers of the vehicle that the stop was for a noise violation.

It is clear based on these facts that the police lacked both the reasonable suspicion to stop the vehicle and the probable cause to search. First, it is settled that police may stop a vehicle for investigatory purposes where they have reasonable suspicion that criminal activity is afoot. That does not appear in the facts here, as [Sergeant] Weaver testified that just before they pulled over the vehicle, they did not hear music. Furthermore, [Sergeant] Weaver never told any occupants of the vehicle that they were being stopped for a violation of the noise ordinance. Instead, the stop seemed to be based on the "red flags" that [Sergeant] Weaver observed, and the fact that he was aware that there were known drug dealers in the vehicle.

Trial Ct. Op., 11/1/17, at 4-5 (unpaginated).

The Commonwealth presents three issues, which have been reordered

as follows:

1. Whether the suppression court erroneously granted suppression where the suppression court although initially finding that the police had a legal basis for stopping the vehicle in question due to the noise ordinance, shortly thereafter improperly determined there was no justification for the stop?

2. Whether the suppression court erroneously determined there was no legitimate basis for searching the vehicle?

3. Whether the suppression court erroneously granted suppression of the evidence because [Appellees] did not have an expectation of privacy in a vehicle as it was not owned nor operated by [them]?

Commonwealth's Brief at 3.[30]

The standards governing our review of an order granting suppression are well settled.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Vetter*, 149 A.3d 71, 75 (Pa. Super. 2016), *appeal denied*, 169 A.3d 577 (Pa. 2017).

The Commonwealth first claims that the officer who detained Appellees "had probable cause to stop and detain" the vehicle in which they were traveling based on a violation of the Lancaster City noise ordinance. Commonwealth's Brief at 18. The Commonwealth notes that undercover

---

[30] The Commonwealth's briefs in 1352 and 1353 MDA 2017 are substantially identical except for the names of the Appellees, and this decision will refer to the briefs as the "Commonwealth's Brief."

officers first heard loud music coming from the parked vehicle from approximately 100 feet away. *Id.* at 17. According to the Commonwealth,

> when the police do encounter this noise violation, the [o]fficers now have probable cause in which to detain the vehicle to issue a citation. The aforementioned vehicle . . . leaves where it is parked and proceeds to drive. The act of the car moving however, does not extinguish the probable cause to stop or detain the vehicle for the noise violation. This situation is analogous to when law enforcement sees a speeding car in violation of posted speed limits. Although the speeding vehicle may slow down before the police stop the car, the driver can still be legally cited for speeding.

*Id.* The Commonwealth provides no further discussion of the noise ordinance and does not cite any legal authority supporting its analogy between a vehicle stop for a noise ordinance violation and for speeding.

As to the Commonwealth's specific argument that a noise violation justified the stop of the Mazda, both Appellees Seals and Dean maintain that the stop was pretextual. Additionally, Appellee Seals notes,

> [t]here is no authority to arrest someone in Lancaster, Pennsylvania for a violation of the noise ordinance at 198-4.B(1)(b). Lancaster, Pennsylvania is a 3rd class city. 42 Pa. §8902(c) authorizes arrest without a warrant for violations of city ordinances for second class cities.[fn8] There was no indication that any of the occupants of the motor vehicle were involved in any crime.
>
> > [fn8] Though not contained in the record, Mr. Seals asks this Honorable Court to take judicial notice of this fact.

Appellee Seals' Brief at 16 (some footnotes omitted).

Appellee Dean acknowledges that Officer Boas testified he heard a noise violation, but notes Sergeant Weaver testified that "at no time in his pursuit

of the vehicle, or when the vehicle was stopped, did he hear any noise or music coming from the vehicle." Appellee Dean's Brief at 13. Appellee Dean observes that the trial court, in its Rule 1925(a) opinion, referred to an "alleged noise" violation and did not "accept as fact that an actual noise violation . . . occurred." *Id.* at 14. Appellee Dean emphasizes that the trial court was under no obligation to credit Officer Boas' testimony regarding the noise violation. *Id.* (citing *Commonwealth v. Santiago*, 980 A.2d 659, 664 (Pa. Super. 2009), for the proposition that "it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented" (citation omitted)).

At the outset, Appellee Dean correctly notes that the trial court could have found Officer Boas' testimony that he heard a noise violation to be incredible. *See Santiago*, 980 A.2d at 664. However, at the suppression hearing, the trial court indicated that the Commonwealth presented "a basis for pulling the vehicle over for the noise ordinance." N.T. at 57. The trial court only later referred to an "alleged noise violation" in its Rule 1925(a) opinion. Therefore, absent a clear indication that the trial court rejected Officer Boas' credibility at the suppression hearing, the use of the term "alleged" in the trial court's opinion does not evince a sufficiently clear rejection of Officer Boas' testimony. *See Vetter*, 149 A.3d at 75; *Santiago*, 980 A.2d at 664. Put differently, given the uncontradicted testimony at the suppression hearing and the trial court's initial finding, a legal analysis of the

validity of the stop must consider that Officer Boas, in fact, heard the noise violation.

Because the Commonwealth relies on that violation to justify the initial detention of the vehicle, it is necessary to summarize the law regarding the enforcement of Lancaster City's noise ordinance. Lancaster City Ordinance Chapter 198 provides in relevant part:

> B. Specific prohibitions. The following acts and the causing thereof are declared to be noise disturbances and therefore in violation of this chapter:
>
> (1) Radios, television sets, musical instruments and similar devices. Operating, playing or permitting the operation or playing of any . . . automobile radio, automobile stereo, high-fidelity equipment or similar device which produces, reproduces or amplifies sound:
>
> * * *
>
> (b) In such a manner as to create a noise disturbance across a property line (boundary), or at 50 feet from such device, whichever is less, when the device is operated in or on a motor vehicle, or hand carried, on a public right-of-way or public space[.]

City of Lancaster Ordinance § 198-4B(1)(b). The penalty provision of Chapter 198 states:

> Whoever violates any provisions of this chapter shall, upon conviction thereof in a summary proceeding, be fined for a first offense, not less than $150 and not more than $1,000; for a second offense be fined not less than $300 and not more than $1,000; for a third offense be fined not less than $500 and not more than $1,000, to be collected as other fines and costs are by law collectible, or imprisoned for not more than 90 days, or both. Whoever violates any provision in this chapter for a fourth offense and for any subsequent conviction shall, upon conviction thereof

in a summary proceeding, be fined $1,000, to be collected as other fines and costs are by law collectible, and be sentenced to a term of imprisonment of not less than five nor more than 90 days. . . .

City of Lancaster Ordinance § 198-4A. The ordinance states that it "shall be enforced by the Bureau of Police. In addition, the Animal Law Enforcement Officer shall be authorized to enforce § 198-4B(6) [relating to noise from animals and birds] and in so doing **shall have the powers of a police officer except the power of arrest**." City of Lancaster Ordinance § 198-8 (emphasis added).

Section 12005 of the Third Class City Code further provides:

. . . A police officer may, without warrant and upon view, arrest and commit for hearing any and all individuals:

\*\*\*

(3) Violating any of the ordinances of the city for the violation of which a fine or penalty is imposed.

11 Pa.C.S. § 12005(3).

Pennsylvania Rule of Criminal Procedure 400 provides that a summary proceeding "shall be instituted either by: (1) issuing a citation to the defendant; or (2) filing a citation; or (3) filing a complaint; or (4) arresting without a warrant when arrest is specifically authorized by law." Pa.R.Crim.P. 400. As to the issuance of a citation, Pa.R.Crim.P. 405 states:

(1) the law enforcement officer who issues the citation shall exhibit an official sign of the officer's authority; and

(2) the law enforcement officer contemporaneously shall give the defendant a paper copy of the citation containing all the information required by Rule 403.[31]

Pa.R.Crim.P. 405. The comments to Rule 405 recognize that

[a] law enforcement officer may issue a citation based upon information that the defendant has committed a summary violation, which information may be received from a personal observation of the commission of the offense; a witness; **another police officer**; investigation; or speed-timing equipment, including radar.

Pa.R.Crim.P. 405 cmt. (emphasis added); *see also Commonwealth v. Lockridge*, 810 A.2d 1191, 1196 (Pa. 2002).

---

[31] Pa.R.Crim.P. 403 requires, in relevant part, that a citation contain:

(1) the name and address of the organization, and badge number, if any, of the law enforcement officer;

(2) the name and address of the defendant;

(3) a notation if the defendant is under 18 years of age and whether the parents or guardians have been notified of the charge(s);

(4) the date and time when the offense is alleged to have been committed, provided however, if the day of the week is an essential element of the offense charged, such day must be specifically set forth;

(5) the place where the offense is alleged to have been committed;

(6) a citation of the specific section and subsection of the statute or ordinance allegedly violated, together with a summary of the facts sufficient to advise the defendant of the nature of the offense charged;

(7) the date of issuance . . .

Pa.R.Crim.P. 403(A)(1)-(7).

- 23 -

In **Lockridge**, the Pennsylvania Supreme Court observed that the rules governing the institution of a summary proceeding

> are designed to favor the least intrusive means of commencing a summary proceeding, and contemplate that summary cases will be instituted, not by arrest, but by the handing of a citation to a defendant at the time the offense is allegedly committed. These procedures also recognize, however, that the immediate issuance of a citation to a defendant is not always feasible, and provide for the filing of a citation with a district justice.

**Lockridge**, 810 A.2d at 1195 (citations omitted) (discussing introductory comments to Chapter 4 of the Pennsylvania Rules of Criminal Procedure).

As to an arrest, Pa.R.Crim.P. 440 states: "When an arrest without a warrant in a summary case is authorized by law, a police officer who exhibits some sign of authority may institute proceedings by such an arrest." Pa.R.Crim.P. 440. The comments to Rule 440 provide: "It is intended that these proceedings will be instituted by arrest only in exceptional circumstances such as those involving violence, or the imminent threat of violence, or those involving a danger that the defendant will flee." Pa.R. Crim.P. 440 cmt. The arresting officer must also "promptly release" the individual unless the individual poses a threat of immediate physical harm or there are grounds to believe that the individual will not appear to answer the citation. Pa.R.Crim.P. 441.

Therefore, under the relevant statutes, rules, and ordinances, a Lancaster City police officer possess the authority to arrest an individual without a warrant "upon view" of a violation of Chapter 198 and under

execeptional circumstances, including flight. *See* 11 Pa.C.S. § 12005(3); Pa.R.Crim.P. 400(4); *cf.* City of Lancaster Ordinance § 198-8. An officer may issue a citation for a violation of Chapter 198 based on information obtained from another police officer. *See* Pa.R.Crim.P. 400(1)-(2), 405 cmt. In the instant case, the remaining question is whether an officer may stop a vehicle to issue a citation for a noise violation when there is no dispute that the noise violation ended by the time of the traffic stop.

The Commonwealth's analogy to a "speeding car in violation of posted speed limits" provides little guidance. We note that the Pennsylvania Supreme Court has recognized that "'[w]hen vesting a group with police powers and duties, the Legislature does so with specificity.'" ***Commonwealth v. Bullers***, 599 A.2d 662, 666 (Pa. Super. 1991). Violations such as speeding are governed by Motor Vehicle Code, which contains the following specific enforcement provision:

> Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that **a violation of this title is occurring or has occurred, he may stop a vehicle**, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b) (emphasis added). As noted above, Rule 400 also permits the commencement of summary proceeding by issuing a citation. *See* Pa.R.Crim.P. 400. Therefore, when read together, 75 Pa.C.S. § 6308(b) and

Rule 400 authorize an officer to stop a vehicle for present and past violations of the Motor Vehicle Code to issue a citation. Accordingly, without more, the Commonwealth's analogy does not validate the stop for the noise violation under the facts of this case. *See Bullers*, 599 A.2d at 666.

There is one published decision in Pennsylvania, in which an officer stopped a vehicle for a violation of a noise ordinance. *See Commonwealth v. Scott*, 878 A.2d 874 (Pa. Super. 2005). However, the officer stopping the defendant's vehicle in *Scott* personally observed the offense. *Scott*, 878 A.2d at 876. Furthermore, the defendant only challenged the constitutionality of Philadelphia's noise ordinance, which was promulgated under the Philadelphia Traffic Code, as vague and overbroad. *Id.* at 878-80. Therefore, *Scott* is of little guidance, and in the absence of controlling statute, rule of procedure, or case law, it is necessary to consider the general constitutional principles that govern seizures.

It is well settled that: "Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures. Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citations omitted).

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a

stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Pakacki*, 901 A.2d 983, 987 (Pa. 2006) (citations omitted).

As to an investigative detention, this Court has stated:

the *Terry* "stop and frisk," permits a police officer to briefly detain a citizen for investigatory purposes if the officer "observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot." [*Terry v. Ohio*, 392 U.S. 1, 30 (1968)].

*Terry* further held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others" the officer may conduct a pat down search "to determine whether the person is in fact carrying a weapon." "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."

. . . In order to determine whether the police had reasonable suspicion, the totality of the circumstances—the whole picture—must be considered. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." To conduct a pat down for weapons, a limited search or "frisk" of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened. If either the seizure (the initial stop) or the search (the frisk) is found to be unreasonable, the remedy is to exclude all evidence derived from the illegal government activity.

The *Terry* totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters. Moreover, the principles of *Terry* apply to all occupants of the stopped vehicle, not just the driver. Indeed, as we have observed, "roadside encounters, between police and suspects are especially hazardous, and that danger may arise

from the possible presence of weapons in the area surrounding a suspect."

***Commonwealth v. Simmons***, 17 A.3d 399, 403 (Pa. Super. 2011) (citations omitted).

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness'[] upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions . . . ." ***Delaware v. Prouse***, 440 U.S. 648, 653-54 (1979) (citations and quotation marks omitted). "In order to determine the reasonableness of a particular search or seizure a balancing analysis is utilized, wherein the intrusion on the individual of a particular law enforcement practice is balanced against the government's promotion of legitimate interests." ***Commonwealth v. Blouse***, 611 A.2d 1177, 1178 (Pa. 1992) (citations omitted).

As to pretext, however, courts have generally rejected the notion that a ***Terry*** stop is invalid where there is an objective basis to detain a vehicle or an individual for even a minor infraction. ***See Whren v. U.S.***, 517 U.S. 806, 813 (1996); ***Commonwealth v. Chase***, 960 A.2d 108, 120 (Pa. 2008); ***Commonwealth v. Harris***, 176 A.3d 1009, 1020 (Pa. Super. 2017). Therefore, for the purposes of a Fourth Amendment ***Terry*** analysis, an officer's subjective or actual motivations are not determinative in the reasonableness of a stop. ***See Whren***, 517 U.S. at 813.

The issuance of a citation necessarily involves a brief period during which a pedestrian or a subject of a vehicle stop will not be free to leave while the officer obtains information from an individual.  **See** 75 Pa.C.S. § 6308(b) (authorizing an officer conducting a traffic stop to check "the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or . . .  secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of" the Motor Vehicle Code); Pa.R.Crim.P. 403(A)(2) (requiring that a citation contain the name and address of the defendant).

It is further settled that there is a "diminished expectation of privacy in a motor vehicle as compared to a residence or office, due to the pervasive governmental regulation of, and local law enforcement's extensive contact with, motor vehicles." **Commonwealth v. Gary**, 91 A.3d 102, 110 (Pa. 2014) (citation omitted) (discussing United States Supreme Court's reasoning for permitting warrantless searches for vehicles); **see also id.** at 127 (discussing the diminished expectation of privacy in a vehicle under the Pennsylvania Constitution).  Nevertheless, Pennsylvania courts continue to recognize that

> [a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use is subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel.

*Commonweath v. Enick*, 70 A.3d 843, 848 n.5 (Pa. Super. 2013) (citation omitted); *see also Prouse*, 440 U.S. at 657 (noting traffic stops involve "a possibly unsettling show of authority[,]" "interfere with freedom of movement, are inconvenient, and consume time[,]" and may result in "substantial anxiety" in the individual being stopped).

From a constitutional perspective, there appears to be little distinguishing between the intrusiveness of a stop of a pedestrian and a stop of a motor vehicle. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (noting that "the usual traffic stop is more analogous to a so-called '*Terry* stop[']' than to a formal arrest" and holding that *Miranda* warnings are not necessary during an ordinary traffic stop); *Simmons*, 17 A.3d at 403. As the *Berkemer* Court noted:

> [A] detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.[] . . . [The] circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the

motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability.

*Id.* at 437-38.

A government, in turn, has a legitimate interest in regulating noise through ordinances. Furthermore, the government's interest in enforcing violations of its laws and regulations is paramount when there is probable cause to believe a violation occurred or, as here, the violation has been established. **See Whren**, 517 U.S. at 817 ("It is of course true that in principle every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors. With rare exceptions . . ., however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause.").

Nevertheless, this Court cannot ignore the substantial differences between a Motor Vehicle Code violation and a violation of a noise ordinance. With respect to the Motor Vehicle Code, "[t]he state has a vital interest in maintaining highway safety by ensuring that only qualified drivers are permitted to operate motor vehicles, and that their vehicles operate safely, thus assuring that dangerous drivers as well as dangerous automobiles are kept off the road." **See Chase**, 960 A.2d at 120 (citation omitted). By contrast, noise ordinances promote legitimate quality of life issues by

regulating excessive noise.[32]  Those quality of life issues are far less substantial than the public safety interests in the enforcement of even minor violations of the Motor Vehicle Code.

Further, the governmental interests in enforcing a noise ordinance is diminished, where, as here, there is no indication that the noise rose to the level of disorderly conduct.[33]  There were no reported complaints from the public, and the individual violating the statute ceased the noise without further intervention from the public or the police.  There was no indication that the Mazda or its occupants were involved in prior noise violations or noise complaints.  Indeed, aside from Officer Boas' testimony that he heard the noise violation from 100 feet and then 200 feet after passing the Mazda, the Commonwealth failed to establish how long the noise violation occurred or whether the violation was ongoing when the Mazda left the 500 block of Howard Avenue.

---

[32] Chapter 198 was enacted with the following purpose:

> The Council, finding that excessive levels of sound are detrimental to the physical, mental and social well-being of the residents as well as to their comfort, living conditions, general welfare and safety, and being therefore a public health and welfare hazard, hereby declares it to be necessary to provide for the greater control and more effective regulation of excessive sound and the sources of excessive sound within the City.

City of Lancaster Ordinance § 198-1.

[33] *See* 18 Pa.C.S. § 5503(a)(2) ("A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . (2) makes unreasonable noise").

Under these circumstances, the Commonwealth failed to establish that the initial stop of the Mazda was reasonable under the circumstances. The statutes and rules governing the commencement of summary proceedings express a preference that an officer commence the process at the time of the offense. *See* 11 Pa.C.S. § 12005(3) (permitting an arrest upon view of the offense); *Lockridge*, 810 A.2d at 1995 (noting the rules for commencing a summary proceeding favor the use of least restrictive means and contemplate that in ordinary circumstances, an officer will hand the defendant a citation at the time of the offense). An officer may issue a citation based on information obtained from another officer, *see* Pa.R.Crim.P. 405 cmt.; *accord Commonwealth v. Yong*, 177 A.3d 876, 888 (Pa. 2018) (discussing collective knowledge doctrine). However, there is no express authority for an officer to stop a motor vehicle based on a noise ordinance violation. Moreover, the Commonwealth has not established a governmental interest outweighing the individuals' interests in the freedom of movement when traveling in the Mazda.[34] To summarize, Officer Boas made brief observation of the noise violation when the Mazda was parked on the 500 block of Howard Avenue, there was no indication that the violation was ongoing when the Mazda left the scene, and Sergeant Weaver stopped the Mazda eight blocks away without

---

[34] The Commonwealth does not suggest that the "red flags" testified to by Sergeant Weaver constitute an independent basis to stop the vehicle, nor would there be any support for such an argument. *See Commonwealth v. DeWitt*, 608 A.2d 1030, 1034 (Pa. 1992)

hearing any music. Accordingly, the trial court properly concluded that that stop of the Mazda was unreasonable.

Because we conclude that the Commonwealth failed to establish the legality of the initial stop, we briefly address the Commonwealth's further arguments that there was reasonable suspicion to search the vehicle and that Appellees failed to establish an expectation of privacy in the Mazda. *See Commonwealth v. Shabezz*, 166 A.3d 278, 290 (Pa. 2017).

In *Shabezz*, the Pennsylvania Supreme Court considered "whether the illegal seizure, by itself, renders all tainted evidence suppressible as fruit of the poisonous tree . . . ."[35] *Id.* at 287. To answer that question, the *Shabezz* Court established the following framework:

> The inquiry simply is whether the evidence was obtained via exploitation of the initial illegality. . . . [W]hen the defendant seeking suppression following an illegal vehicle stop is the passenger, "[t]he dispositive legal issue is the causal relationship between the traffic stop and the discovery of the evidence: whether the evidence found in the car was 'fruit' of the illegal stop." So long as the taint of the initial illegality has not been removed by other circumstances, the inquiry involves nothing more.

*Id.* at 289. Applying that framework, the Court concluded:

> [the defendant] was a passenger in a vehicle that was blocked in by numerous police vehicles. The police seized the vehicle, proceeded to search it, and uncovered contraband. The search occurred very shortly after the police prevented the vehicle from leaving the lot and arrested the four individuals. The discovery of contraband was a direct and immediate consequence of the

---

[35] In *Shabezz*, the Court found that the stop of the vehicle in which the defendant was travelling was illegal. *Shabezz*, 166 A.3d at 284.

seizure, and, thus, was an "exploitation" of the constitutional violation.

The record is devoid of any indicia that the taint of the illegal seizure was removed before the police searched the car and found evidence. None of the traditional circumstances that have been found to purge the taint of an unconstitutional act, *i.e.* attenuation, inevitable discovery, independent source, or some intervening act or event are present in this case. The search occurred minutes after the seizure, a lapse in time short enough to leave no viable argument that the search was sufficiently attenuated from the seizure so as to purge the taint of the initial illegality. Additionally, although [the defendant] briefly fled the scene and was chased by two officers, other officers remained with the vehicle and commenced the search immediately upon [the defendant's] return to the scene. Nothing about [the defendant's] brief flight from the scene broke the direct causal chain between the illegal seizure and the search of the vehicle.

Similarly, the flight itself was insufficient to purge the taint of the initial illegality. The flight was brief. [The defendant] was apprehended within a few blocks of the 7–11 lot. A minimal amount of time passed between the seizure and [the defendant's] subsequent apprehension. Those two events were not sufficiently attenuated from one another so as to break the chain of events flowing directly from the initial seizure. Flight, standing alone, does not *ipso facto* cure the illegality of a seizure.

*Id.* at 290.

Instantly, the Commonwealth does not argue any of the traditional circumstances that could purge the taint of the initial illegal stop. *See id.* Accordingly, because the initial stop was illegal, and in the absence of any argument that the subsequent actions by the officers were sufficiently attenuated from the stop, we discern no merit to the Commonwealth's arguments that the search was proper or that Appellees were required to demonstrate an expectation of privacy in the vehicle. *See id.*

Orders affirmed.

- 35 -

Judge Stabile concurs in the result

Judge Platt concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/30/2018