J-S08010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| GREGORY CHARLES SUNY, | |
| Appellee | No. 1999 EDA 2017 |

Appeal from the Order Entered May 18, 2017
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0005266-2015

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and STEVENS,  P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 02, 2019**

The Commonwealth appeals from the trial court's order granting suppression of evidence seized from Gregory Charles Suny, Appellee.  After careful review, we affirm.

The trial court summarized the testimony it heard at the suppression hearings in this case, held on February 18, 2016 and March 28, 2016, as follows:

> The Commonwealth first called Detective Thomas Long to testify. Detective Long is [a] fourteen (14) year Haverford Township Police Officer who was then presently assigned to the Criminal Investigation Division.
>
> His duties include investigating all sorts of crime that occurs within Haverford Township referred by the patrol division.

---

[*] Former Justice specially assigned to the Superior Court.

He estimates he has come into contact with marijuana twenty (20) times in the course of his career and he is familiar with the smell of marijuana and what it looks like and[,] when considering his assistance of other officers[,] he's encountered marijuana upwards of fifty (50) to sixty (60) times.

On July 7, 2015[,] he was in the area of Earlington Road near Monoa Road in Haverford Township where he was backing-up patrol officers there with an incident which[,] at the time of his arrival[,] was under control.

At approximately 7:45 pm on the evening of July 7, 2015[,] he heard a radio call by police dispatch advising of an Act 64 violation in the Sunoco parking lot on Township Line Rd.  That is, there was a drug transaction between two males.  According to the call, one male was in a black Ford Explorer and the other in a BMW.  The location was on Township Line Road at the Sunoco near Meadowbrook Road.  The address was 400 East Township Line Road. Detective Long proceeded into the Sunoco parking lot.

On arrival[,] Detective Long observed a black Ford Explorer as described in the broadcast.  It had taken him "20 seconds" to arrive and he was operating a white Ford Expedition police vehicle. CS-1 was marked for identification[,] and Detective Long identified it as an aerial view of the Sunoco gas station and surrounding vicinity.

Detective Long used the aerial map to describe the positioning of his vehicle and the positioning of the black Ford Explorer. Thereafter[,] Detective Long recalled his vehicle was actually blue.

Detective Long testified that he did not position his vehicle in such a way as to prevent the black Ford Explorer from exiting the Sunoco parking lot.  Detective Long did not engage his lights or sirens when he pulled in to the lot.  He observed a lone [C]aucasian male occupant in the front seat of the Explorer. Detective Long exited his vehicle and approached the driver's side of the black Ford Explorer.  The testimony was repeated that [Appellee]'s black Ford Explorer was not blocked from moving or exiting.

The detective engaged the operator and told him the nature of the call that was received and he immediately smelled the odor of marijuana.  Visually he could see pieces of what he believed to be marijuana scattered on the floor between the driver's seat and his feet.

[Appellee] stipulated to his identification as the operator of the black Ford Explorer.

Detective Long was wearing a holstered firearm that was plainly visible. According to the Detective[,] [Appellee] was nervous and fidgety and his speech was stammered. The Detective clarified the smell was fresh marijuana[,] [not] burnt.

Detective Long asked the driver to step out of the vehicle for further investigation of the marijuana on the floor that he personally observed.

As [Appellee] exited the black Ford Explorer, the Detective noticed a clear small plastic bag almost falling out of [Appellee]'s pocket. The Detective testified that [Appellee] admitted to possessing marijuana. At that point, since he was obviously going to arrest [Appellee,] he patted [Appellee] down for officer safety while being transported.

Detective Long retrieved the bag containing marijuana and also retrieved a second bag … that was empty. There was also in [a] pocket a black athletic sock that was rolled up[.] [I]nside the sock was a glass smoking pipe and a small bag of suspected crystal methamphetamine[.] [T]here was [also] a container that appeared to be intended to look like a D cell battery that was actually a storage container[,] and inside was another bag of suspected crystal methamphetamine. At that point[,] [Appellee] was placed under arrest and placed in a patrol car for transport.

Thereafter, based on the presence of marijuana in the vehicle, Detective Long believed he had sufficient probable cause to search [it].

…

On cross-examination[,] Detective Long testified that he provided the information to the Affiant, the actual author of the incident report. Prior to the [s]uppression [h]earing[,] he reviewed the incident report and the notes of testimony of the preliminary hearing. He also reviewed other case materials.

Counsel for [Appellee] had DS-1 marked which was a document stipulated as the CAD[1] report consisting of four (4) pages. The report indicates that the event was created at "1941:13" which is when the actual caller called dispatch and DELCOM created this event.

[1]CAD report is the information put out from DELCOM broadcast summarized in a report[.]

The substance of the call was for suspected drug activity and transactions at the Sunoco station. The Detective [was] handed DS-2 which depict[ed] the same photographic information set forth on CS-1. DS-2 [was] used to have Detective Long place "x's" where the exits were located.

Detective Long first observed the black Ford Explorer when he was driving on Township Line Road. He testified that [Appellee]'s Explorer was not blocking any right of way or exit in the Sunoco station. On continuing cross-examination[,] the Detective testified that he had no plate information or tag for the BMW. He didn't see the BMW when he arrived. As he approached [Appellant,] he was not concerned for his safety. The Detective reiterated that he was investigating the call about the drug transaction.

On arrival the Detective did not believe he possessed sufficient probable cause to detain the operator of the black Ford Explorer[,] which is why he was cautious not to block [Appellee]'s black Ford Explorer. Hypothetically, the Detective testified that he would have followed [Appellee] if he ha[d] pulled away from the scene and likely would have investigated the vehicle tag.

The first thing that Detective Long said to [Appellee] was that he identified himself and said that he was there investigating a possible drug transaction that occurred and his vehicle matched the vehicle that was broadcast.

The vehicle matched the report. During the encounter[,] Detective Long asked [Appellee] to turn the vehicle off and place his hands on the steering wheel. At that point[,] he detected an odor of fresh marijuana[,] and as he processed the smell[,] he detected he concomitantly observed what he believed to be marijuana flakes on the seat and driver floor board. At that point he realized there may be something to the suspected drug transaction call.

The Detective [was] shown his testimony from the September 3, 2015 preliminary hearing. Therein[,] he testified that after approaching and engaging the [Appellee][,] he smelled marijuana and saw [what he believed to be marijuana] ... on the floor by his feet. Thereafter[,] Detective Long asked [Appellee] to step out of the vehicle[,] which was not an invitation but a command.

The Detective opened the door and [Appellee] exited and was instructed to put his hands on the top of the vehicle for [a] pat-down. At the same time[,] Detective Long asked [Appellee] if he had anything on him that he should be worried about and [Appellee] responded that he had marijuana on his person. There were three other police cars on the scene. Detective [Long]'s car would have been unmarked but the other two (2) cars would have [been] marked police cars. [Appellee] was handcuffed when the other officers arrived.

Detective Long testified that he conducted the pat-down because he had seen and smelled the marijuana that was on the floor so based on that[,] [Appellee] was asked to step from the vehicle.

As [Appellee] stepped from the vehicle[,] the incriminating nature of the baggie containing the marijuana was in plain view. Although [Detective Long] could not actually discern the marijuana in the baggie[,] he recognized the baggie as a baggie typically utilized to carry marijuana. The baggie was taken and a pat-down conducted (looking for needles[,] etc.) and then he retrieved the items that were in [Appellee]'s pockets. As far as the pat-down[,] the Detective could feel the bag was not empty and[,] as far as the rest of the pat-down[,] he could feel what turned out to be a battery.

[Appellee] was not [issued **Miranda**[1] warnings] at the scene. [B]ased on finding marijuana, the [D]etective believed he had probable cause to search the vehicle.

The [D]etective didn't ask to search the car because he was going to perform an inventory search incidental to the arrest and tow of the vehicle.

There were smoking devices found but the Detective d[id] not recall the precise location in the vehicle.

A mirror with residue was recovered as well as a scale that was recovered. Also there were suboxone films recovered[,] and an empty baggie was found in [Appellee]'s pocket.

By way of background, two recorded transmissions were made. One was made at 7:41 p.m.[,] which is "CS-3" as well as the transmission beginning at 7:46 and 8 seconds. There [was] a 20-

---

[1] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

second long call and a [30-]second long call. The first call indicate[d] the call was for a "drug deal." The caller saw a bunch of cash being exchanged…. The caller g[ave] no information that drugs [were] actually exchanged. The second call [was] for possible Act 64 activity at 400 East Township Line Road. Detective Long testified that any difference in the state [of] the car [was] related to the towing company's retrieval where he testified the window was down and the photo show[ed] the driver window "rolled up."

On re-direct[,] Detective Long [was] asked whether he could see the marijuana in the baggie [at] the time [Appellee] stepped out of the vehicle. The Detective did not see the marijuana but[,] between the marijuana he saw on the driver floor board and the baggie[,] he connected the contraband.

…

The Commonwealth next called Detective Jerry Goodman … to the stand to testify. He [was] in his eighteenth year (18th) at the Haverford Township Police Department. He [was] assigned to the investigations division, narcotics unit and also assigned to the Delaware County Drug Task Force.

He spoke with [Appellee] in relation to a narcotics investigation. This conversation took place in the arraignment room. That is the processing area of the Police Department. Prior to speaking to him Detective Goodman went over the *Miranda* Warnings. CS-4 [was] marked and identified as a *Miranda* Warning Waiver Form from the Haverford Township Police Department. [Appellee] initialed each question and then the Detective sign[ed] the form. The Detective read the form to [Appellee]. [Appellee] read the form himself. [Appellee] initialed and signed the form.

[Appellee] did not ask to speak to a lawyer. Then Detective Goodman asked [Appellee] for consent to look into his cell phone. CS-5 is a consent to search electronic device form. After requesting the search be limited to his texts, [Appellee] signed the form. Then Detective Goodman searched through the text messages on [Appellee]'s phone.

On cross-examination[,] Detective Goodman testified he was unaware of what went on from the time when [Appellee] was arrested up to when he was Mirandized. The Detective repeated that [Appellee] understood his *Miranda* warnings and waiver. Detective Goodman and Detective Long both questioned

[Appellee]. However, initially Detective Long simply observed. [Appellee] proffered some explanation initially that he was owed money[,] which led to questions by the detective as to why they did not meet at a residence. In the 20-30 minute conversation[,] [Appellee] stated that he was not a drug dealer and that he did not sell drugs. The search of [Appellee]'s cell phone arose as a means for [Appellee] to prove that he was not a drug dealer.

Two (2) cell phones were recovered. One was broken. Detective Goodman didn't threaten to get a search warrant if [Appellee] didn't consent. On re-direct examination, Detective Goodman testified that [Appellee] never indicated to him that some other officer or detective threatened [Appellee] in any way.

Detective … Goodman was called to the stand at the continuing suppression hearing on March 28, 2016[,] at which time he was asked to identify the consent to search authorization for the phone and the text messages and photographs of the text messages that were seized.

…

Detective Goodman was shown DS-8. He testified the photograph appear[ed] to be a view of the Sunoco from the view of one looking towards Meadowbrook Road.

Detective Goodman [was] then shown what was marked as DS-11. DS-11 depicts the front end of a car. Goodman [was] asked if this approximate[d] the location of [Appellee]'s car the day he was arrested[,] to which the Detective responded [that Appellant]'s car was further away than the distance depicted on DS-11. Generally[,] Detective Goodman recall[ed] that as it pertain[ed] to DS-11. Detective Long's car was further off than the nose cones depicted on that picture would indicate. Detective Goodman [was] then shown DS-12 which [was] an image depicting a greater distance between the bumper and the cone. Detective Goodman testifie[d] that this approximate[d] the relative positions of Detective Long's vehicle and [Appellee]'s vehicle on the day of the arrest. Ultimately Detective Goodman could not testify [as to] whether any part of the front of … Detective Long's vehicle was directly in front of [Appellee]'s vehicle.

Trial Court Opinion ("TCO"), 8/9/18, at 3-12.

The Commonwealth charged Appellee with possession with intent to deliver a controlled substance, 35 P.S. § 780-113(a)(30), three counts of possession of a controlled substance, 35 P.S. § 780-113(a)(16), possession of small amount of marijuana, 35 P.S. § 780-113(a)(31), and ten counts of possession of drug paraphernalia, 35 P.S. § 780-113(a)(32). On November 4, 2015, Appellee filed a timely motion to suppress the seized physical evidence, as well the incriminatory statements he made while in police custody, the latter as fruit of the poisonous tree stemming from the ostensible illegality of the initial seizure. As noted above, the trial court conducted a bifurcated suppression hearing on February 18, 2016 and March 28, 2016. On May 18, 2017, the trial court issued an order granting suppression of the physical evidence and statements, and an accompanying opinion expressing its findings of fact and conclusions of law.

The Commonwealth filed the instant interlocutory appeal on June 15, 2017. In its notice of appeal, the Commonwealth certified that "under Pa.R.A.P. [] 311(d)[,] the suppression order will terminate or substantially handicap the prosecution." Commonwealth's Notice of Appeal, 6/15/17, at 1. The Commonwealth then filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on July 6, 2017. The trial court issued its Rule 1925(a) opinion on August 9, 2018.

The Commonwealth now presents the following questions for our review:

> [I.] The detective did not pull-over [Appellee]'s vehicle, activate his lights and siren, order [Appellee] out of his vehicle, or [his]

vehicle from leaving the parking lot. Was the detective's approach of [Appellee] a mere encounter?

[II.] The detective observed marijuana in plain view on [Appellee]'s lap and on the floor of his vehicle and smelled marijuana emanating from the vehicle. Did the officer have probable cause to arrest [Appellee], perform a search incident to arrest, and search his vehicle?

Commonwealth's Brief at 2.

We begin with our standard of review:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*In re O.J.*, 958 A.2d 561, 564 (Pa. Super. 2008) (*en banc*) (cleaned up).

The Commonwealth asserts that Appellee was not effectively seized prior the discovery of contraband in plain view.

Our courts have long recognized three levels of interaction that occur between the police and citizens that are relevant to the analysis of whether a particular search or seizure conforms to the requirements of U.S. CONST. amend. IV and P.A. CONST. art. I, § 8.

The first of these is a mere encounter (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an investigative detention must be supported by reasonable

suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or custodial detention must be supported by probable cause.

In assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity. Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative detention or **Terry**[2] stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; whereas, a custodial detention is legal only if based on probable cause. To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

**Commonwealth v. Lyles**, 54 A.3d 76, 79-80 (Pa. Super. 2012) (cleaned up).

The Commonwealth's first claim concerns the trial court's determination that Detective Long subjected Appellee to an investigative detention, requiring reasonable suspicion of criminal activity, when the detective approached

---

[2] **Terry v. Ohio**, 392 U.S. 1 (1968).

Appellee's vehicle, while visibly armed and displaying his badge, immediately after ostensibly positioning his vehicle in a manner that prevented Appellee from leaving the parking lot. The Commonwealth argues that the detective did not block Appellee's vehicle and, therefore, Appellee was only subject to a mere encounter that did not require any level of suspicion. Notably, the Commonwealth makes no effort to argue that Detective Long possessed reasonable suspicion at that point to subject Appellee to an investigative detention.[3] Hence, this case turns solely on the question of whether Appellee reasonably believed he was free to leave as Detective Long approached his vehicle.

The Commonwealth argues that: "The trial court erred by concluding that the detective seized [Appellee] when he alighted from his vehicle and walked towards [Appellee]'s vehicle. The detective did not pull [Appellee] over or block his exit. Consequently, the detective's initial interaction with [Appellee] was a mere encounter." Commonwealth's Brief at 13. The framing of the Commonwealth's argument effectively concedes that if Detective Long did block Appellee's exit, such action would have constituted an investigative

_____

[3] Nevertheless, the trial court addressed this issue, and concluded that Detective Long did not possess reasonable suspicion that Appellee was engaged in criminal activity. **See** TCO at 24-25 (reasoning that: the information obtained from the anonymous tip lacked specificity; the tip was not sufficiently verified by Detective Long merely because he observed that Appellee's vehicle matched the vague description given by the tipster; where the other vehicle described by the tipster was not present; and where no further observations were made by Detective Long to support the suspicion that a drug transaction had occurred until after the court had determined that an investigative detention had been effectuated). We agree.

detention requiring, at a minimum, "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Lyles*, 54 A.3d at 79.

Critically, the Commonwealth insists that in "its conclusions of law, the trial court reiterated that the detective did not block [Appellee]'s vehicle from exiting when he pulled into the parking lot." Commonwealth Brief at 15. The Commonwealth's assertion is belied by the record. The Commonwealth mistakes the trial court's summary of the *testimony* provided by Detective Long, for the court's factual conclusions. In its Rule 1925(a) opinion, the trial court plainly stated that it "specifically rejected and does not credit the testimony that [Appellee]'s vehicle was not blocked under the circumstances[.]" TCO at 24. The factual findings of a suppression court, to which we afford great deference, "are dependent on the suppression court's credibility determinations." *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

Thus, several factual findings, considered in the totality of the circumstances, support the trial court's determination that Appellee did not reasonably believe he was free to leave when he saw Detective Long approaching his car. First, his most obvious and safe means of departure was blocked by Detective Long.[4] Second, it is undisputed that Detective Long was

_____

[4] The Commonwealth incredulously suggests that Appellee could have put his vehicle in reverse and backed away from the officer. We liken this argument to one where an officer has blocked a doorway, leaving a suspect the option to crawl out a window. Certainly, there may be some possibility of escape in virtually all circumstances where a suspect has not yet been physically restrained by law enforcement, but the mere existence of such possibilities

visibly armed, and that his badge was prominently displayed. Third, Detective Long exited his vehicle and immediately moved toward Appellee's driver's side door, with the clear intent to engage him.[5]

The Commonwealth further claims that the trial court's determination stands counter to our Supreme Court's ruling in **Commonwealth v. Au**, 42 A.3d 1002 (Pa. 2012). However, the **Au** decision is clearly distinguishable in two significant respects. First, the **Au** decision turned on whether a mere encounter had escalated into an investigative detention when police officers asked the occupants of a parked vehicle for identification; the Court decided that it had not so escalated. Accordingly, the import of the **Au** decision was that "a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter." **Id.** at 1007. Second, the predicate determination that the occupants had been only subject to a mere encounter before the questioning occurred was not at issue in **Au**. In

_____

does not undermine the legal conclusion that a *reasonable* person would not feel free to leave under the circumstances. Indeed, investigative detentions are inherently less restrictive than outright arrests, which is why they require a lesser degree of suspicion to effectuate lawfully. **See Lyles**, **supra**. By blocking Appellee's vehicle from the front, Detective Long restricted his liberty of movement, although not to such a degree that it constituted the effectual equivalent of an arrest.

[5] While Detective Long's subjective intent was not relevant, the manner of the detective's approach was nevertheless relevant to the totality of the circumstances test, as a reasonable person would not feel free to leave when being approached by an officer in this manner. A reasonable person would believe, in such circumstances, that he or she has been compelled to interact with the officer who is approaching him.

any event, the *Au* decision was premised on a different fact pattern, one directly at odds with the present case. When the officer in *Au* initially came upon the parked vehicle, he "positioned his vehicle at an angle relative to the parked automobile so as to illuminate the passenger side." *Id.* at 1003. The "officer [testified] that he did so without blocking the egress of the vehicle[.]" *Id.* The trial court had credited that testimony in denying Au's motion to suppress. Here, however, the trial court granted suppression, and found similar testimony by Detective Long not credible. As such, *Au* does not compel this Court to reverse the trial court's suppression order in this case. Accordingly, we conclude the Commonwealth's first claim lacks merit.

Next, the Commonwealth contends that Detective Long had probable cause to arrest Appellee once he discovered marijuana in plain view, and that both the search incident to arrest and search of Appellee's vehicle were justified by that probable cause. However, we need not address this claim, as we agree with the trial court that Appellee was effectively seized absent reasonable suspicion immediately prior to Detective Long's detection of the marijuana. Accordingly, the subsequent discoveries were fruit of the poisonous tree. *See Commonwealth v. Shabezz*, 166 A.3d 278, 280 (Pa. 2017) (holding that "contested evidence, tainted by the initial illegality, must be suppressed, even absent a demonstrable expectation of privacy in the locations where the evidence was found").

Order *affirmed*.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/2/19</u>